345 F.2d 310
 Carolyn BRADLEY and Michael Bradley, infants, by Minerva
Bradley, their mother and next friend, et al., Appellants,
v.
The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, H. I.
Willett, Division Superintendent of Schools of the City of
Richmond, Virginia, and E. J. Oglesby, Alfred L. Wingo and
E. T. Justis, individually and constituting the Pupil
Placement Board of the Commonwealth of Virginia, Appellees.
 No. 9471.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 5, 1965.
Decided April 7, 1965.
 
 Henry L. Marsh, III, and S.W. Tucker, Richmond, Va., for appellants.
 Henry T. Wickham, Sp. Counsel, City of Richmond (J. Elliott Drinard, City Atty. of Richmond, and Tucker, Mays, Moore & Reed, Richmond, Va., on brief), for appellees School Board of City of Richmond, Va., and H. I. Willett, Division Superintendent of Schools of Richmond, Va.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN, and J. SPENCER BELL, Circuit Judges, sitting en banc.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 This is the second time the second of two Richmond school cases has been before us. This time the principal question is whether the School Board adequately discharges its duty under the law when it gives to every pupil an unrestricted right to attend the school of his choice, or that of his parents. The District Court held that it does, and we agree. There are other subsidiary questions.
 
 
 2
 * This case was begun by eleven Negro pupils and their parents or guardians. The eleven pupils had been denied admission to schools attended entirely, or predominantly, by white pupils. Before trial, one was admitted to the school of his choice, and the Court ordered the admission of the remaining ten. In doing so, the Court found that, in general, assignments were being made on the basis of dual attendance zones, that promotions from primary to junior high schools and from junior high schools to senior high schools were controlled by a feeder system, and that transfer requests by Negroes attending Negro schools were denied on the basis of criteria which were not employed in processing the applications of white pupils living in the same residence area and wishing to attend the same school to which the Negro pupils sought to be transferred. These discriminatory practices, of course, were condemned, and it was because they had been employed that the District Judge ordered the admission of the remaining ten plaintiffs.
 
 
 3
 While the District Judge thus clearly pointed up the faults in the practices which had governed school assignments for the 1961-1962 school year, the requested general injunctive order was denied. Denial of injunctive relief beyond the requirement of enrollment of the individual plaintiffs in the schools of their choice was predicated upon the Court's finding that the School Board had taken affirmative steps to eliminate discriminatory practices in handling enrollments in the first grade of all primary schools and in those of one of the high schools.
 
 
 4
 On the first appeal the question in this Court was whether the District Court should have granted general injunctive relief in addition to requiring the admission of the individual plaintiffs. We concluded[1] that he should have issued the requested injunction because of the evident fact that discriminatory practices had been followed in handling admissions and transfer applications. One member of this Court dissented upon the ground that he thought an injunction unnecessary since the District Court had clearly pointed out to the Board what was necessary to be done, and there was no reason to suppose that the Board would not do it. The case was to be retained upon the docket, which was adequate, in the opinion of the dissenter, to assure that if further relief became requisite, it could be had readily.
 
 
 5
 The first appeal in this case was brought to this Court by the plaintiffs, not by the School Board, and in this Court the Board did not take issue with the conclusions of the District Court about the deficiencies in its earlier handling of admissions and transfer applications. It suggested a willingness to comply with the requirements outlined in the District Judge's memorandum opinion, contending only that it should have a reasonable opportunity to do so without the need of a formal injunctive order.
 
 
 6
 It was thus not surprising that while the first appeal was still in the bosom of this Court, the Richmond School Board adopted resolutions designed to eliminate the objectionable features in the practices theretofore followed by it and the Virginia Pupil Placement Board.
 
 
 7
 These resolutions, adopted in March, 1963, as subsequently construed and limited by the District Court, provide that every pupil initially entering the Richmond School system, or his parent for him, is required to state his choice as to the school he wishes to attend. He is assigned to the school of his choice. Every pupil promoted from any elementary school in Richmond, or his parent for him, is required to make a similar choice, and he is assigned to the school of his choice, as are those promoted from junior high school to senior high school. Every other pupil is assigned to the school he previously attended, but he may apply for a transfer to any other school, and, since transfer requests are routinely granted without hearings or consideration of any limiting criteria,[2] he is assigned to the school of his choice. When this case was orally argued in this Court on October 5, 1964, we were assured that no timely transfer application had been denied since adoption of the resolutions of March, 1963.
 
 
 8
 Since pupils have been assigned in the Richmond schools pursuant to the 1963 scheme for the 1963-4 and 1964-5 school years, it appears that every pupil in the first two grades of primary school, junior high school and senior high school are attending the school affirmatively selected by him or his parents as the one he and they wished him to attend. Every other pupil in the school system has and has had an unrestricted right of transfer, which the District Court found had been adequately publicized and made known to pupils and parents.
 
 
 9
 Under the School Board's resolutions, as construed by the District Court, all attendance areas have been abandoned; there is no longer a feeder system for handling promotions from one level to another, and transfer requests are allowed without discriminatory conditions.
 
 
 10
 There are some limiting factors. Transfer applications by one previously assigned to a school must be submitted before June 1 to be granted effectively as of the opening of the next school year. This requirement the District Court found reasonable in light of the planning needs of the Board. There is also a provision that a transfer application by a pupil previously assigned to a school may be denied, if the school to which entry is sought does not have the capacity to receive him. The plan does not spell out what would happen in the event of a denial of an application upon the ground of want of capacity, but the District Judge thought that the reservation was not of practical importance because, so far, there has been no want of capacity to allow all transfer applications, and no transfer request has been denied on that ground, or, indeed, for any other reason except lack of timeliness.[3]
 
 
 11
 Upon remand of the case after the first appeal, the District Court entered an appropriate general injunction in conformity with the opinion of this Court. Thereafter the School Board filed with the Court the resolutions it had adopted in March 1963, and counsel for the plaintiffs filed objections to them as a plan for the subsequent operation of the schools.
 
 
 12
 The original plaintiffs having all been admitted to schools of their choice, two other pupils and their parents entered the case. They had applied on September 6, 1963 for admission to a high school attended predominantly by white pupils, and their applications had been denied as being too late. The District Judge promptly ordered their admission, since he had not approved the plan and its requirement that transfer applications be filed before June 1 to be granted effectively for the ensuing school year. Thereafter, there was a further hearing as to the reasonableness and propriety of the resolutions adopted by the School Board, after which the Court filed a memorandum opinion on March 16, 1964 approving the Board's plan as construed and limited by the Court.[4]
 
 
 13
 In finding that the plan, as to us, therefore, it appears that the School Board's resolutions, as construed by the District Court, provide for a freedom of choice by every individual in the Richmond school system as to the school he attends. There also is a requirement that the choice be affirmatively exercised by every pupil entering the system for the first time and by every other pupil as he moves from one level to another.
 
 
 14
 In finding that the plan, as operated, does provide for unrestricted freedom of choice, the District Judge largely disregarded the potential limitation of the school capacity provision. For the present, we think he was justified in doing so. It had not been invoked at the time of the hearing for the purpose of denying any transfer application, and we are assured that it has not since then been invoked. Until some occasion arises for its invocation, it is irrelevant. Thereafter, what the School Board does may affect the validity of its operation,[5] but we are entitled to assume that the unrestricted freedom of choice which has been available to all pupils and parents in the school system for the past two school years will continue to be available, or that the School Board will make other adjustments which are approvable by the Courts.[6] The mere fact, however, of a possibility that capacity problems may affect the operation of the plan in future years has no immediate bearing upon the validity of what the School Board has done for the years now under consideration when the capacity limitation was inoperative.
 
 
 15
 The Negro plaintiffs do not question the present existence of an unrestricted freedom of choice in selection of schools. Their position on appeal is that freedom of choice is not an appropriate means for elimination of segregation. Extracting a phrase from the second Brown decision,[7] in which there was reference to 'states requiring or permitting such discrimination,' the plaintiffs insist that there are a sufficient number of Negro parents who wish their children to attend schools populated entirely, or predominantly, by Negroes to result in the continuance of some schools attended only by Negroes. To that extent, they say that, under any freedom of choice system, the state 'permits' segregation if it does not deprive Negro parents of a right of choice.
 
 
 16
 It has been held again and again, however, that the Fourteenth Amendment prohibition is not against segregation as such. The proscription is against discrimination. Everyone of every race has a right to be free of discrimination by the state by reason of his race. There is nothing in the Constitution which prevents his voluntary association with others of his race or which would strike down any state law which permits such association. The present suggestion that a Negro's right to be free from discrimination requires that the state deprive him of his volition is incongruous.
 
 
 17
 The phrase from the second Brown decision to which the plaintiffs refer lends no support to their contention. The first paragraph of the opinion, in which the phrase appears, clearly and precisely expresses the proscription against 'discrimination.' There is no hint of a suggestion of a constitutional requirement that a state must forbid voluntary associations or limit an individual's freedom of choice except to the extent that each individual's freedom of choice may be affected by the equal right of others. A state or a school district offends no constitutional requirement when it grants to all students uniformly an unrestricted freedom of choice as to schools attended, so that each pupil, in effect, assigns himself to the school he wishes to attend.
 
 
 18
 This and other courts have repeatedly referred to the legality and propriety of a system of free transfers.
 
 
 19
 We first did so in Dillard v. School Board of City of Charlottesville, 4 Cir., 308 F.2d 920, 923-924. In an opinion previously prepared by Senior Judge Soper, subsequently adopted per curiam as the opinion of the en banc court, there was approving reference to systems of unrestricted rights of transfer, which were said to have been conspicuously successful in Baltimore and in Louisville. Subsequently, in Jeffers v. Whitley, 4 Cir., 309 F.2d 621, while condemning a compulsive system sought to be justified on the basis of assertions of volition of the pupils, we indicated en banc our approval of a truly voluntary system under which at reasonable intervals reasonable alternatives were available to all pupils, so that those who wished to do so might attend a school with members of the other race. Finally, when this case was before us earlier, this Court, anticipating the School Board's implementation of a system of free assignments and transfers, indicated its appropriateness, provided pupils, parents and the public in general were all informed of it. We there said in summary:[8]
 
 
 20
 '* * * As we clearly stated in Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962), the appellants are not entitled to an order requiring the defendants to effect a general intermixture of the races in the schools but they are entitled to an order enjoining the defendants from refusing admission to any school of any pupil because of the pupil's race. The order should prohibit the defendants' conditioning the grant of a requested transfer upon the applicant's submission to futile, burdensome or discriminatory administrative procedures. If there is to be an absolute abandonment of the dual attendance area and 'feeder' system, if initial assignments are to be on a nondiscriminatory and voluntary basis, and if there is to be a right of free choice at reasonable intervals thereafter, consistent with proper administrative procedures as may be determined by the defendants with the approval of the District Court, the pupils, their parents and the public generally should be so informed.'Though the School Board's resolutions of 1963 were adopted before our previous opinion was announced, they were clearly in anticipation of it. As subsequently put into practice with the limitations and interpretations imposed upon them by the District Court, the School Board has followed precisely the suggestions of this Court made in this very case.
 
 
 21
 The underlying principle was originally announced by three-judge courts upon remand of two of the original school cases decided in Brown.[9] It has received recent affirmation in decisions in the Second, Fifth and Seventh Circuits, as well as in this one.
 
 
 22
 In the New Rochelle, New York, cases, after Judge Kaufman found that the all-Negro Lincoln School was in a gerrymandered zone deliberately drawn by the School Board for the purpose of segregating the school population,[10] the question arose as to the appropriate remedy. The School Board submitted a plan of limited transfers, which the District Court modified so as to make it a plan of substantially unrestricted transfers. The modified plan was approved by the District Court.[11] Under this plan, each pupil in the Lincoln school was to be given the right to transfer to some other school in New Rochelle. Each transfer applicant was to be requested to list four other elementary schools in the order of his preference, and such applications would be granted subject to the capacity of the school, or schools, to which entry was sought. Transfer applications had to be submitted before June 1st to be considered for the ensuing school year, and the parents of the transfer applicants were advised that they, themselves, would have to furnish whatever transportation was required.
 
 
 23
 The Court of Appeals for the Second Circuit affirmed the plant embodied in Judge Kaufman's decree.[12] It construed that plan as comparable to the Baltimore plan and said of it, 'We think this plan an eminently fair means of grappling with the situation, in accord with the principles stated in the Brown case.'
 
 
 24
 Judge Moore dissented in Taylor. His primary disagreement was with the original finding that the Lincoln zone was gerrymandered, and that the School Board purposely imposed the racial character of the school. He also thought the permissive transfer plan, approved as an appropriate solution, was unfair because other pupils in the New Rochelle school district had no comparable rights. His dissent, however, suggests no disagreement with the principle that if all the pupils in a school district are given a substantially unfettered freedom of choice as to the schools they attend, the School Board fully complies with the requirements of the Brown case and its successors.
 
 
 25
 In Bell v. School City of Gary, Indiana, 7 Cir., 324 F.2d 209, the Court, in approving assignments based upon geographic zoning, emphasized the Constitution's proscription against discrimination and the absence of any prohibition of segregation, itself. The inflexible geographic zoning system was approved, notwithstanding the fact that its product was de facto segregation in the schools.[13]
 
 
 26
 In Calhoun v. Latimer, 5 Cir., 321 F.2d 302, Atlanta's inverted stair-step plan of desegregation was approved, notwithstanding it would not be accomplished until well within the 1970's, and notwithstanding that the only means provided for desegregation of the 'desegregated' grades was permissive transfer, which, under the plan approved by the District Court, was allowable only if the applicant met certain criteria. His achievement, for instance, had to be at least as high as the average in the school to which he sought to be transferred. Judge Rives dissented, both because the transfer provision was restricted and because twelve years for the accomplishment of desegregation in all grades was too long. In denying a petition for rehearing, the majority made it clear that, in subsequent operation, transfer applications should be processed on a nondiscriminatory basis, and specifically required that the scholastic requirement be abandoned except to the extent it was required of white applicants.
 
 
 27
 The judgment in Calhoun v. Latimer was vacated by the Supreme Court.[14] The opinion of the Supreme Court recites that the Atlanta School Board had adopted 'additional provisions authorizing free transfers with certain limitations' in the 'desegregated' grades of the high schools. The Court thought that the new resolutions should be first appraised by the District Court after an evidentiary hearing, and, for that purpose, the case was remanded, with the admonition, based upon other recent cases, that the discretion for approval of a prolonged transition period is not so great now as it once was.
 
 
 28
 We, of course, would not have approved the transfer provisions considered by the Fifth Circuit in Calhoun v. Latimer.[15] The interesting thing, however, is that the Court approved a plan for the allowance of transfers as an appropriate device to bring the school system into compliance with the legal requirements. Even the Atlanta Board's most recent resolutions, adopted on April 8, 1964, were said by the Supreme Court to have contained factors to be considered by the Board in making initial assignments and in allowing transfers. If a remand was appropriate there, there is certainly no suggestion that provision for an unrestricted freedom of choice in initial assignments to each school level and in procuring transfers is not a permissible and appropriate means of finally terminating all enforced segregation and bringing the school system into full compliance with the law.
 
 
 29
 That it is, was also indicated by the Supreme Court in its opinion in Goss v. Board of Education of City of Knoxville, 373 U.S. 683, 687, 83 S.Ct. 1405, 1408, 10 L.Ed.2d 632. In disapproving a provision for minority transfers, it specifically noted that it would have an entirely different case if the plan provided for transfers regardless of the race of the applicant and the racial composition of the school to which he was assigned. Such a plan, the Supreme Court said, would permit freedom of choice 'entirely free of any imposed racial considerations.'
 
 
 30
 In addition to the cases previously considered, this Court has indicated that a system of free transfers superimposed upon a plan of geographic zoning is unobjectionable and permissible.[16] The plaintiffs suggest agreement that such an arrangement would be unobjectionable, but they urge that an approvable geographic scheme of original assignments must underlie a plan giving all pupils freedom of choice. We find, however, that an underlying geographic plan is not a prerequisite to the validity of a freedom of choice plan. A system of free transfers is an acceptable device for achieving a legal desegregation of schools.[17] Its acceptability is not dependent upon the concurrent use of some other device which also might be adequate. In this circuit, we do require the elimination of discrimination from initial assignments as a condition of approval of a free transfer plan.[18] Imposed discrimination is eliminated as readily by a plan under which each pupil initially assigns himself as he pleases as by a plan under which he is involuntarily assigned on a geographic basis.
 
 
 31
 The Richmond School Board was clearly told by the opinion of the District Judge after the first hearing that it must abolish its former system of dual zones. In the opinion of this Court in the first appeal, we affirmed and restated the obvious illegality of dual zoning.
 
 
 32
 The School Board might have complied with the directions of the District Court, affirmed here, by redrawing all zone boundaries so as to provide a single zone for each school without overlapping, but that would have been a major task and open to challenge everywhere as to whether zone lines were reasonably and fairly drawn without regard to race. The other means of abolishing the dual zone system was to do away with zones completely. From the point of view of the ultimate objective of eliminating the illegal dual zoning, dezoning seems the obvious equivalent of rezoning and, administratively, far easier of accomplishment when the School Board intends ultimate operation to be founded upon the free choice of the pupils.
 
 
 33
 It is suggested in this Court that fault should be attributed to the Board because 'it has done nothing' since our mandate went down following the first appeal. The suggestion is a perversion of the facts. The Board's resolutions of March 1963 were adopted, of course, before our mandate went down. They preceded the entry of the judgment, but, as subsequently construed and amended by the District Judge, they effectively abolished the dual zoning system, the feeder system and the requirement that transfer applications be considered in the light of discriminatory criteria. The resolutions effectively removed all of the objectionable features which the District Court had found in the procedures which had been followed earlier. That a defendant acquiesces in the adverse findings of the District Court and brings itself into compliance with the District Court's opinion before its affirmance on an appeal in which they are uncontested by the defendant is reason for some commendation and not for censure.
 
 
 34
 Of course, it is literally untrue that the Board has done nothing since the mandate of this Court in the first appeal went down. It has accepted the District Court's limitations upon and restriction of its March 1963 resolutions, and has actually operated under them as so construed and limited. Subsequent operation entirely free of any taint of the discriminatory practices which this Court condemned is substantial activity following in point of time the earlier judgment of this Court. If the Board's subsequent conduct fully complies with the earlier opinion of this Court, the Board is subject to no criticism whatever for having taken initial steps to bring itself in compliance with this Court's mandate before this Court formally acted.
 
 II
 
 35
 The plaintiffs also complain that the District Court did not enjoin consideration of race in the assignment of teachers and administrative staff.
 
 
 36
 It has been held that when there is enforced segregation of pupils, an order requiring the desegregation of teachers and staff does not go 'beyond the permissible range of the trial court's choice of means to put an end to an operation of schools on a racially segregated basis.'[19] In such a case, the District Court may prefer other means, and when he employs more direct methods, exclusively, there generally will be involved no abuse of discretion.[20] In the usual case, so long as the ultimate objective is adequately served, the choice of means is finally, as well as initially, for the District Court.
 
 
 37
 In a particular factual setting, it may be contended that consideration of race in the assignment of teachers and staff coerces the pupils and effects a discrimination against them. The pupils have standing to raise such a question to the extent it involves an asserted denial of constitutionally protected rights of the pupils.[21] An appropriate allegation tendering such a question may not be stricken, for, whether in a particular case it may be regarded as a question of law or of fact, a resolution of so important a matter should await a full hearing on the merits.[22]
 
 
 38
 The question of assignment of teachers was ignored in the hearings below. The plaintiffs have made no effort to develop a record upon which a finding of actual discrimination against pupils could be predicated. There has been no inquiry as to the possible relation, in fact or in law, of teacher assignments to discrimination against pupils, nor has there been any inquiry as to the impact of such an order as the plaintiffs seek upon the administration of the schools and upon the teachers and the administrative personnel. The undeveloped record furnishes no basis for judgment apart from a conviction, in agreement with the Fifth Circuit,[23] that decision cannot precede a full and complete inquiry in the District Court into the merits.
 
 
 39
 When there has been no inquiry into the matter, it cannot be said that the plaintiffs have discharged the burden they must shoulder of showing that such assignments effect a denial of their constitutional rights.
 
 
 40
 Whether and when such an inquiry is to be had are matters with respect to which the District Court also has a large measure of discretion. The Fifth[24] and Sixth[25] Circuits have so held, and we agree. When direct measures are employed to eliminate all direct discrimination in the assignment of pupils, a District Court may defer inquiry as to the appropriateness of supplemental measures until the effect and the sufficiency of the direct ones may be determined. The possible relation of a reassignment of teachers to protection of the constitutional rights of pupils need not be determined when it is speculative. When all direct discrimination in the assignment of pupils has been eliminated, assignment of teachers may be expected to follow the racial patterns established in the schools. An earlier judicial requirement of general reassignment of all teaching and administrative personnel need not be considered until the possible detrimental effects of such an order upon the administration of the schools and the efficiency of their staffs can be appraised along with the need for such an order in aid of protection of the constitutional rights of pupils.
 
 III
 
 41
 Finally, the attorneys for the appellants ask an award of attorneys' fees. They asked for such fees in the District Court and were awarded a nominal fee because of their representation of the two additional plaintiffs whose entry into the school of their choice was ordered by the District Judge, despite the fact that their applications were belated. While the District Court's order was otherwise generally unfavorable to the plaintiffs, and we affirm it here, the plaintiffs' attorneys say that as a result of their efforts in the first trial the plaintiffs obtained very substantial relief. It is true that the original plaintiffs did obtain substantial relief in the District Court in the first trial, and it is true also that we directed an award of attorneys' fees in Bell v. School Board of Powhatan County, Virginia, 4 Cir., 321 F.2d 494.
 
 
 42
 It is only in the extraordinary case that such an award of attorneys' fees is requisite. In school cases throughout the country, plaintiffs have been obtaining very substantial relief, but the only case in which an appellate court has directed an award of attorneys' fees is the Bell case in this Circuit. Such an award is not commanded by the fact that substantial relief is obtained. Attorneys' fees are appropriate only when it is found that the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinacy. Whether or not the board's prior conduct was so unreasonable in that sense was initially for the District Judge to determine. Undoubtedly he has large discretion in that area, which an appellate court ought to overturn only in the face of compelling circumstances.
 
 
 43
 We can find no abuse of the District Court's discretion in refusing to allow attorneys' fees in a larger amount than it did.
 
 
 44
 We thus find no error in the District Court's order.
 
 
 45
 Affirmed.
 
 
 46
 ALBERT V. BRYAN, Circuit Judge (concurring).
 
 
 47
 Just what more is the entitlement of the Negro pupils beyond what the Richmond School Board has done to eliminate racial discrimination in pupil attendance is not clear to me. I expressly note my concurrence in the present opinion, which is in every way satisfactory, only to accent the view that the Board's concern, consideration and action have been exemplary. Besides, this attitude demonstrates the needlessness of the injunction we imposed in the prior Richmond appeal.
 
 
 48
 SOBELOFF and J. SPENCER BELL, Circuit Judges (concurring in part and dissenting in part).
 
 
 49
 We gravely doubt whether the Resolution of the Richmond School Board qualifies as a 'plan of desegregation.' In approving it, however, the District Court expressed several careful reservations and cautions to the Board which we understand our brethren of the majority accept and adopt as part of their affirmance. In light of this, and in the hope of encouraging the Board so to administer the Resolution as to make it a genuine and effective plan of desegregation, we concur in that part of the majority's affirmance. We feel constrained, however, to make such concurrence tentative on the assumption that the Resolution is an interim measure only and will be subject to full review and reappraisal either at the end of the present school year, or certainly not later than this fall after the opening of the 1965-66 school term, when the results of two years of the Resolution's operation will be known.
 
 
 50
 * The Richmond School Board, in reading the majority opinion, must keep in mind the teaching of the Supreme Court, and this court as well, in a stream of cases decided during the past decade: that the initiative in achieving desegregation of the public schools must come from the school authorities. The paper Resolution is not being hailed as the attainment of the final goal. The defendants have only stated an hypothesis-- that once Negro pupils are given the right to choose where they want to go to school they will be in a position to avail themselves of the opportunity and the segregated school system will disappear. The majority opinion permits that hypothesis to be tested against the realities of the Richmond situation to determine whether it will in fact achieve the desired result.
 
 
 51
 Only experience will show whether the so-called plan represents a real change in the officials' attitude toward their constitutional duty, or merely a strategic retreat to a new position behind which the forces of opposition will regroup.
 
 
 52
 While we join in permitting this experiment, we are not fully persuaded that the plan will be enough to enable the Negro pupils to extricate themselves from the segregation which has long been firmly established and resolutely maintained in Richmond. A procedure which might well succeed under sympathetic administration could prove woefully inadequate in an antagonistic environment. The procedure cannot be separated from the spirit that produced it and will motivate its application.
 
 
 53
 As the defendants claim that theirs is the 'Baltimore Plan' for free determination of school assignments, it is in order to examine not only the text but the context of the Baltimore Plan. There are reasons why a Free Transfer System could achieve a measure of success in Baltimore.
 
 
 54
 Maryland is a border state which in the Civil War remained in the Union by a very slim margin. Baltimore is only 150 miles from Richmond. Before the Brown decision the traditions of the people of the two cities in regard to public education were not divergent. Baltimore's City Code also required separate schools for Negroes. The reception accorded the decision of May 17, 1954, however, was markedly different. Within two weeks thereafter, the City Solicitor of Baltimore ruled that all laws imposing segregation could no longer be considered constitutional. The members of the School Board and other public officials organized no program of resistance. There was no holding back for contested lawsuits to wind their way through the courts nor were they content to pass a resolution casting upon Negro children and their parents the onus of ending the existing system.
 
 
 55
 Promptly the Board took the initiative to integrate. In less than a month after the Court spoke, the Superintendent of Schools assembled every teacher in the Baltimore school system. He addressed them at length on the duty to abolish racial separatism in public education in an effort to prepare them for such steps as needed to be taken to make the Supreme Court decision effective in practice.[1] Similar measures were taken by the School Board to enlist the active support of the Co-ordinating Council of Parent-Teacher Organizations, which included men and women of both races.
 
 
 56
 Other meetings were held throughout the city under the sponsorship of the Department of Education to make the transition from a segregated to an integrated nonracial administration as smooth as possible, and school faculties were encouraged to receive graciously new pupils and staff members of the other race.
 
 
 57
 From time to time the Board on its own initiative re-examined the practical operation of its policies to assure their effectiveness. Notable is its forthright declaration that 'the presence whenever possible of qualified persons of varied ethnic, cultural, religious, and educational backgrounds on the staff of a given school, bureau or division is considered desirable.'[2]
 
 
 58
 Sharply contrasting has been the course of events in Richmond. Ten years after the Supreme Court's decision outlawing segregation, and five years after the invalidation of Virginia's massive resistance laws by the Supreme Court of Appeals of Virginia as well as the federal court, the School Board's attitude, as presented by its attorneys in this case, is that 'there is no duty upon the School Board to integrate a particular school or desegregate it' or to 'promote integration.' A change from this attitude is imperative if the Richmond declaration, whether it is called a Resolution or a Plan, is to be constitutionally implemented.
 
 
 59
 A plan of desegregation is more than a matter of words. The attitude and purpose of public officials, school administrators and faculties are an integral part of any plan and determine its effectiveness more than the words employed. If these public agents translate their duty into affirmative and sympathetic action the plan will work; if their spirit is obstructive, or at best negative, little progress will be made, no matter what form of words may be used.
 
 
 60
 Affirmative action means more than telling those who have long been deprived of freedom of educational opportunity, 'You now have a choice.' In many instances the choice will not be meaningful unless the administrators are willing to bestow extra effort and expense to bring the deprived pupils up to the level where they can avail themselves of the choice in fact as well as in theory. A court, before approving a plan, must scrutinize it in detail to satisfy itself that the assumptions upon which the plan is predicated are actually present. The district judge must determine whether the means exist for the exercise of a choice that is truly free and not merely pro forma. This may involve considering, for example, the availability of transportation, the opportunity to participate on equal terms in the life of the school after the pupil's arrival, and any other circumstances that may be pertinent.
 
 
 61
 All recognize that the problems of education are not simple and are intertwined with problems in other areas of public and private activity. But while a complete solution does not lie in the hands of the present defendants, there is much they can do in their own sphere of responsibility to disestablish the heritage arising from imposed racial discriminations of the past.
 
 
 62
 It is now 1965 and high time for the court to insist that good faith compliance requires administrators of schools to proceed actively with their nontransferable duty to undo the segregation which both by action and inaction has been persistently perpetuated. However phrased, this thought must permeate judicial action in relation to the subject matter.[3]
 
 
 63
 This is far from suggesting that children are to be uprooted arbitrarily and bussed against their will to distant places merely to place them with children of the other race. No such thing has been proposed or contemplated in Richmond or, so far as we know, anywhere in this circuit. The true alternative, however, surely is not abdication of Board responsibility and the leaving of accomplishment of a nonracial educational system to the unaided efforts of individuals who, even if not deliberately obstructed, lack the knowledge and mastery of the school system possessed by the Board. The authorities, not these individuals, have the duty and power to provide adequate leadership in reaching, with a minimum of personal frictions, alarms and frustrations, the constitutionally protected goal of equal educational opportunity for all children. See Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1964).
 
 II
 
 64
 There are certain features of the court's decision with which we are unable to agree. These concern the desegregation of faculties and staffs, the dissolution of the 1963 injunction, and the adequacy of the counsel fee awarded.
 
 
 65
 The composition of the faculty as well as the composition of its student body determines the character of a school. Indeed, as long as there is a strict separation of the races in faculties, schools will remain 'white' and 'Negro,' making student desegregation more difficult. The standing of the plaintiffs to raise the issue of faculty desegregation is conceded. The question of faculty desegregation was squarely raised in the District Court and should be heard. It should not remain in limbo indefinitely. After a hearing there is a limited discretion as to when and how to enforce the plaintiffs' rights in respect to this, as there is in respect to other issues, since administrative considerations are involved; but the matter should be inquired into promptly. There is no legal reason why desegregation of faculties and student bodies may not proceed simultaneously.
 
 
 66
 The 'freedom of choice' plan being only an interim measure, the adequacy of which is yet unknown, this court should reinstate the June 3, 1963, injunction dissolved by the District Court when it approved the plan. In Brooks v. County School Board of Arlington County, 324 F.2d 303 (4th Cir. 1963), where an injunction had been dismissed by the District Court immediately after a school board adopted a resolution formally rescinding its policy of segregation, this court ordered reinstatement of the injunction. We there held the dismissal premature because there had been no showing by the school board of continuing compliance.
 
 
 67
 We also dissent from the allowance of only $75.00 as counsel fees to the plaintiffs, which we deem egregiously inadequate. It will not stimulate school boards to desegregate if they see that they can gain time by resisting to the eleventh hour without effective discouragement of these tactics by the courts.
 
 
 68
 The principle applied by this court in Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494 (4th Cir. 1963), needs to be extended, not narrowed. See Note, 77 Harv.L.Rev. 1135 (1964). It ought not to be reserved for the most extreme cases of official recalcitrance, but should operate whenever children are compelled by deliberate official action or inaction to resort to lawyers and courts to vindicate their clearly established and indisputable right to a desegregated education. Counsel fees are required in simple justice to the plaintiffs. The award of fees in this equity suit is in the court's judicial discretion and should be commensurate with the professional effort necessarily expended. One criterion which may fairly be considered is the amounts found reasonable in compensating the Board's attorneys for their services. While public monies, aggregating thousands of dollars, are paid defense lawyers, the attorneys for the plaintiffs who have prosecuted these cases for two full rounds in the District Court and on appeal are put off with a miniscule fee of $75.00.
 
 
 
 [1]
 Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 317 F.2d 429
 
 
 [2]
 The resolution provides that school capacity may be a limiting factor. As a practical matter it has not been thus far. That matter is discussed, infra
 
 
 [3]
 Two transfer applications made on September 6, 1963 were denied as tardy. They are mentioned below
 
 
 [4]
 The School Board's resolutions, for instance, provide for denial of transfer applications when denial 'is in the best interest of the pupil.' Such a provision, of course, could provide a means of discrimination, and the District Court ordered that it not be applied in any case unless its purpose and effect were made definite and certain by an amendment, and the amendment had been approved by the Court. The School Board's resolutions also contain a limiting qualification that the chosen school must be equipped to meet the pupil's 'program.' This qualification the District Court approved with the admonition that it should be employed only when the courses the pupil seeks are not taught in the school he seeks to enter. Obviously, there is no discrimination involved if primary grade pupils are not allowed to enter high schools or when pupils are required to remain within other program subdivisions based upon objective criteria unrelated to race and applied without discrimination
 
 
 [5]
 There was testimony by one of the school officials that the intention was to proceed as do the Baltimore schools when a particular school reaches capacity; indeed, that the intention was to apply all of the Baltimore plan just as it is operated in Baltimore. Obviously, if the capacity limitation is so applied as to result in the denial of transfer applications of Negro pupils attending schools in which there are few or no white pupils upon the ground that all schools attended substantially by white pupils are over-capacity, there would be no 'freedom of choice,' as that term has been employed in this context. Such freedom exists in a practical sense only when a pupil wishing to attend a school with substantial numbers of the other race has an unequivocal and realizable right to do so. If his first choice be unavailable, some other reasonable alternative must be available to him
 
 
 [6]
 The District Court limited its approval of the plan prospectively, so that if and when the Board resorts to the capacity limitation, its use of it must be approvable
 
 
 [7]
 Brown v. Board of Education of Topeka, 349 U.S. 294, 298, 75 S.Ct. 753, 755, 99 L.Ed. 1083
 
 
 [8]
 Bradley v. School Board of City of Richmond, 4 Cir., 317 F.2d 429, 438
 
 
 [9]
 Briggs v. Elliott, E.D.S.C., 132 F.Supp. 776; Brown v. Board of Education of Topeka, D.C.Kan., 139 F.Supp. 468
 
 
 [10]
 Taylor v. Board of Education of City School District of City of New Rochelle, D.C.S.D.N.Y., 191 F.Supp. 181
 
 
 [11]
 Taylor v. Board of Education of City School District of City of New Rochelle, D.C.S.D.N.Y., 195 F.Supp. 231
 
 
 [12]
 Taylor v. Board of Education of City School District of City of New Rochelle, 2 Cir., 294 F.2d 36
 
 
 [13]
 See also Downs v. Kansas City Board of Education, 10 Cir., 336 F.2d 988; Lynch v. Kenston School District Board of Education, N.D.Ohio, 229 F.Supp. 740; Webb v. Board of Education of City of Chicago, N.D.Ill., 223 F.Supp. 466; Evans v. Buchanan, D.Del., 207 F.Supp. 820; Henry v. Godsell, E.D.Mich., 165 F.Supp. 87; Brown v. Board of Education of Topeka, D.Kan., 139 F.Supp. 468, 470. Cf. Blocker v. Board of Education of Manhasset, New York, E.D.N.Y., 226 F.Supp. 208, and Branche v. Board of Education of Town of Hempstead, School District No. 1, E.D.N.Y., 204 F.Supp. 150
 
 
 [14]
 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288
 
 
 [15]
 Green v. School Board of City of Roanoke, Virginia, 4 Cir., 304 F.2d 118; Dodson v. School Board of City of Charlottesville, Virginia, 4 Cir., 289 F.2d 439; Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 278 F.2d 72
 
 
 [16]
 Dodson v. School Board of City of Charlottesville, Virginia, 4 Cir., 289 F.2d 439
 
 
 [17]
 Calhoun v. Latimer, 5 Cir., 321 F.2d 302, vacated and remanded for another reason, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288; Taylor v. Board of Education of City School District of City of New Rochelle, 2 Cir., 294 F.2d 36; Dodson v. School Board of City of Charlottesville, Virginia, 4 Cir., 289 F.2d 439 (plan found discriminatorily applied); Dillard v. School Board of City of Charlottesville, Virginia, 4 Cir., 308 F.2d 920, 923-924
 
 
 [18]
 Buckner v. County School Board of Greene County, Virginia, 4 Cir., 332 F.2d 452
 
 
 [19]
 Board of Public Instruction of Duval County, Florida v. Braxton, 5 Cir., 326 F.2d 616, 620
 
 
 [20]
 See Calhoun v. Latimer, 5 Cir., 321 F.2d 302, vacated on other grounds, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288
 
 
 [21]
 Griffin v. County School Board of Prince Edward County, Virginia, 4 Cir., 339 F.2d 486; Northcross v. Board of Education of City of Memphis, Tenn., 6 Cir., 333 F.2d 661; Jackson v. School Board of City of Lynchburg, Virginia, 4 Cir., 321 F.2d 230; Mapp v. Board of Education of City of Chattanooga, Tenn., 6 Cir., 319 F.2d 571; Augustus v. Board of Public Instruction of Escambia County, Florida, 5 Cir., 306 F.2d 862; Christmas v. Board of Education of Harford County, Maryland, D.C.D.Md., 231 F.Supp. 331
 
 
 [22]
 Augustus v. Board of Public Instruction of Escambia County, Florida, 5 Cir., 306 F.2d 862
 
 
 [23]
 Augustus v. Board of Public Instruction of Escambia County, Florida, 5 Cir., 306 F.2d 862
 
 
 [24]
 Augustus v. Board of Public Instruction of Escambia County, Florida, supra, note 23
 
 
 [25]
 Mapp v. Board of Education of City of Chattanooga, Tenn., 6 Cir., 319 F.2d 571
 
 
 [1]
 The following passage appears in the address delivered to the 5000 Baltimore teachers by Dr. John H. Fisher, now Dean of Education at Columbia University, then the Superintendent of the Baltimore Department of Education:
 'Without fear and without subterfuge, our Board has met its responsibility. Paraphrasing the words of Robert E. Lee, we cannot now do more than our duty, we shall not want to do less * * *.'
 
 
 [2]
 'Equality of Educational Opportunity-- A Progress Report for the Baltimore City Public Schools' (1964)
 
 
 [3]
 Speaking of the district court's duty in a similar context, the Supreme Court said:
 'The court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'
 The Court also speaks of--
 'The need to eradicate past evil effects and to prevent the continuation or repetition in the future of the discriminatory practices * * *.' Louisiana et al. v. United States, 85 S.Ct. 817 (U.S. March 8, 1965).