Pecola Annette WRIGHT et al., Plaintiffs,

v.

COUNTY SCHOOL BOARD OF GREENS-VILLE COUNTY, VIRGINIA et al., Defendants.

Civ. A. No. 4263.

United States District Court
E. D. Virginia,
Richmond Division.

Jan. 27, 1966.

S. W. Tucker, Henry L. Marsh, III, Willard H. Douglas, Jr., Richmond, Va.,

Jack Greenberg, James M. Nabrit, III, New York City, for plaintiffs.

Frederick T. Gray, Williams, Mullen & Christian, Richmond, Va., H. Benjamin Vincent, Emporia, Va., for defendants.

BUTZNER, District Judge.

The infant plaintiffs, as pupils or prospective pupils in the public schools of Greensville County, and their parents or guardians have brought this class action asking that the defendants be required to adopt and implement a plan which will provide for the prompt and efficient racial desegregation of the county schools, and that the defendants be enjoined from building schools or additions and from purchasing school sites pending the court's approval of a plan. The plaintiffs also seek attorneys' fees and costs.

The defendants have moved to dismiss on the ground that the complaint fails to state a claim upon which relief can be granted. They have also answered denying the material allegations of the bill.

Greensville County is a rural county located on the North Carolina line. Approximately 4,500 pupils attend county schools, about 2,700 are Negro and 1,800 are white. Its school board operates one white and four Negro elementary schools, and separate Negro and white high schools. Both white schools are located in Emporia, a town near the center of the county. Homes of Negro and white persons are scattered throughout the county.

Prior to September 1965, the county operated segregated schools based on a system of dual attendance areas. The white schools in Emporia served all white pupils in the county. The four Negro elementary schools were geographically zoned, and the Negro high school served all Negro pupils in the county.

Until April 1965 the county operated under the Virginia Pupil Placement Act, § 22–232.1 et seq., Code of Virginia, 1950, as amended. During that time only one Negro applied for admission to a

white school, and she withdrew her application.

In April 1964 Negro citizens petitioned the school board to adopt a plan to desegregate the schools. The board did not comply with their request, and this suit was filed on March 15, 1965.

On April 21, 1965 the school board adopted a plan to comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. This plan has been amended several times. It was approved by the United States Commissioner of Education on January 12, 1966 after the hearing in this case.

In September 1965, 72 Negro pupils were transferred, upon their applications, to white schools—35 to Emporia Elementary School and 37 to the high school. One or more Negro pupils are in every grade from the first through the tenth.

There are no white teachers in the Negro schools and no Negro teachers in the white schools. The board has held integrated faculty meetings. Last summer an integrated faculty conducted a "Head Start" program in a Negro school, which was attended by 97 Negro children.

The Greensville County plan provides:

"The Greensville County School Board has adopted a policy of complete freedom of choice to be offered annually in all grades of all schools without regard to race, color or national origin.

"*SECTION I. ASSIGNMENT OF PUPILS*

"A form letter will be sent home by every child containing provisions of the freedom of choice plan with a placement form at least 15 days before the date when the form must be returned. This procedure will be followed annually.

"*A. Pre-Registration of First Grade Pupils for Fall of 1966*

"Pre-registration of pupils planning to enroll in first grade for the fall 1966 semester will take place in all of the elementary schools on Friday, May 13. Under policies adopted by the Greensville County School Board parents or guardians may go directly to the school of their choice wherein they wish to send their child to school next year. At the time of pre-registration a choice may be expressed by filling in a Greensville County pupil placement form. The assignment will be made without regard to race, color, creed, or national origin. In the event of overcrowding preference will be given without regard to race to those choosing the school who reside closest to it. No choice submitted prior to the deadline will be rejected for any reason other than overcrowding of facilities.

"Pupils who fail to register on May 13 may be registered at the school of their choice on August 26th immediately prior to the opening of schools for the 1966 fall semester, but first preference in choice of schools will be given to those who pre-register in the spring period.

"*B. Pupils Entering Other Grades*

"Each parent will be sent annually a letter, the text of which is attached, explaining the provisions of the plan, together with a choice of school form, the text of which is also attached, at least 15 days before the date when the choice form must be returned. Choice forms and letters to parents will also be readily available to parents or students in the school offices during regular business hours.

"The choice of school form must either be mailed or brought to the school or to the Supintendent's office within 15 days from the date the forms were initially sent home by that school. The annual date for sending these forms home shall be May 1st or the closest school day thereto. Anyone not registering his choice by that date must file his choice of school form at the time of registration when school opens. Pupils and their parents or guardians are required to exercise their choice of schools and no pupil will be admitted or readmitted to any school until such a choice has been made as herein specified.

"This choice is granted to parents, guardians and their children. Teachers, principals, and other school personnel are not permitted to advise, recommend or otherwise influence choices. They are not permitted to favor or penalize children because of choices.

"C. Overcrowding

"All choices of pupils, their parents or guardians for every grade in the Greensville County School System will be subject to the following qualification:

"In the event overcrowding of a school would result if all choices to attend that school were granted, priority shall be given without regard to race, color or national origin, and with no preference for previous attendance at the school, to those children choosing the school who reside closest to it. In the case of elementary schools those whose choices to attend a school are denied on this basis will be notified and permitted to make a choice of another formerly all white or all Negro school. In the case of high schools those whose choices to attend a school are denied on this basis will be assigned to the other school in the system at which the grade is taught. Otherwise, all choices will be granted; none will be denied for any reason other than overcrowding. The standards prescribed by the Virginia Department of Public Instruction as to overcrowding shall be used in determing [sic] whether overcrowding exists with respect to any application which is denied.

"D. Any newly enrolled pupil who moves into the county may secure placement forms from the principal of the school of their choice necessary to complete registration and enrollment. The same detailed instructions mentioned above regarding their right of free choice of schools will be furnished to them at this time.

"E. This system will not accept non-resident students, nor will it make arrangements for resident students to attend schools in other school systems, where either such action would tend to preserve segregation or minimize desegregation. Any arrangement made for non-resident students to attend schools of this system, or for resident students to attend schools in another system, will assure that such students will be assigned without regard to race, color or national origin, and such arrangement will be fully explained in attachment made a part of this plan.

"SECTION II. BUS ROUTES

"Transportation will be provided on an equal basis without segregation or other discrimination because of race, color or national origin. The right to attend any school in the system will not be denied because of lack of school system transportation from the pupils home to the school chosen and the pupil or his family may have to provide their transportation if the school system is not required to provide it under the next sentence of this paragraph. To the maximum extent feasible, buses will be routed so as to serve each pupil choosing any school in the system. In any event, every student eligible for bussing shall be transported to the school to which he is assigned as a provision of this plan if his first choice is either the formerly white or the formerly Negro school nearest his residence.

"SECTION III. EXTRA-CURRICULAR ACTIVITIES, FACILITIES AND SERVICES

"There shall be no discrimination based on race, color, or national origin, with respect to any services, facilities, activities and programs sponsored by or affiliated with the schools of this system.

"SECTION IV. STAFF DESEGREGATION

"A. The Greensville County School Board will assign all teachers on the basis of objective criteria such as cer-

tification, overall preparation and qualification for the position desired. In the case of each teacher employed by the school system in the 1964–65 school year who is not now employed, the race, color or national origin of such teacher was not a factor in the decision not to continue his or her employment. Steps shall be taken starting with the 1965–66 school year for the desegregation of faculty, at least including such actions as joint faculty meetings and joint in-service programs. Commencing immediately the following steps will be taken toward the elimination of segregation of teaching and staff personnel:

"1. The pre-school in-service countywide teachers meetings will be held on a completely integrated basis.

2. All countywide staff meetings will be completely integrated.

3. All in-service classes will be open to all teachers regardless of race, color or national origin.

"B. This school system will not demote or refuse to re-employ principals, teachers, and other staff members who serve pupils on the basis of race, color or national origin. Any reduction in staff which may be required as a result of a decrease in enrollment will be accomplished without regard to race, color or national origin."

The school board has prefaced its plan by stating it has adopted a policy of complete freedom of choice for assignments.

Freedom of choice is a term frequently used when speaking of school desegregation. It has several meanings which should not be confused. It may refer to enrollment of pupils in segregated schools with the aid of state tuition grants in preference to attendance at public desegregated schools. See Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 222, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Dure, Individual Freedom versus "State Action," 38 Va.Q.Rev. 400 (1962); Dillard, Freedom of Choice and Democratic Values, 38 Va.Q.Rev. 410 (1962).

In its plan the county uses the phrase, "freedom of choice," in an entirely different context. It employs the term to describe its method of assigning pupils to the public schools. The phrase probably was adopted from, "A General Statement of Policies under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools," published by the Department of Health, Education and Welfare.

The term freedom of choice has been used to describe various methods of assigning pupils. One method initially assigns pupils on a racial basis and allows freedom of choice to transfer from the initial assignment. This system of assignment is not sanctioned in this Circuit. In Bradley v. School Board of the City of Richmond, Va., 345 F.2d 310, 319 (4th Cir. 1965) vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), Judge Haynsworth said:

"In this circuit, we do require the elimination of discrimination from initial assignments as a condition of approval of a free transfer plan."

Cf. Bowditch v. Buncombe County Bd. of Educ., 345 F.2d 329 (4th Cir. 1965); Nesbit v. Statesville City Bd. of Educ., 345 F.2d 333 (4th Cir. 1965); Buckner v. County School Board of Greene County, Va., 332 F.2d 452 (4th Cir. 1964).

Freedom of choice also has been used to refer to a non-restrictive assignment system. Judge Haynsworth described this method of assignment in Bradley v. School Board of the City of Richmond, Va., 345 F.2d 310, 314 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed. 187, 1965):

"[E]very pupil initially entering the Richmond school system, or his parent for him, is required to state his choice as to the school he wishes to attend. He is assigned to the school of his choice. Every pupil promoted from any elementary school in Richmond, or his parent for him, is required to make a similar choice, and he is assigned to

the school of his choice, as are those promoted from junior high school to senior high school. Every other pupil is assigned to the school he previously attended, but he may apply for a transfer to any other school, and, since transfer requests are routinely granted without hearings or consideration of any limiting criteria, he is assigned to the school of his choice."

The Richmond plan was approved tentatively in *Bradley*. The pupil assignment features of the Greensville County plan are similar in material respects to those found in the Richmond plan. Greensville County requires a mandatory choice to be made annually by both white and Negro pupils. In this respect it satisfies a more strict interpretation of the requirements of the Fourteenth Amendment than that which was applied to the Richmond plan. In Bell v. School Board of the City of Staunton, Va., 249 F.Supp. 249 (W.D.Va. 1966), Judge Michie disapproved a plan which did not contain a provision for annual mandatory choice in all grades.

The principal attack leveled by the plaintiffs against the plan is its failure to assign pupils on a geographical basis. They contend that a freedom of choice plan does not satisfy the school board's obligation to eliminate racial segregation from the school system.

In this circuit both freedom of choice plans and geographical zoning plans have been found constitutional. Bradley v. School Board of the City of Richmond, Va., 345 F.2d 310 (4th Cir. 1965) vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965) (freedom of choice plan); Gilliam v. School Board of City of Hopewell, Va., 345 F.2d 325 (4th Cir. 1965) vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965) (geographical zoning plan).

■■■ The school authorities have the primary responsibility for initiating plans to achieve a lawful school system. Brown v. Board of Education, 349 U.S.

294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). This circuit has recognized that local authorities should be accorded considerable discretion in charting a route to a constitutionally adequate school system. Freedom of choice plans are not in themselves invalid. They may, however, be invalid because the "freedom of choice" is illusory. The plan must be tested not only by its provisions, but by the manner in which it operates to provide opportunities for a desegregated education. In this respect operation under the plan may show that the transportation policy or the capacity of the schools severely limits freedom of choice, although provisions concerning these phases are valid on their face. This plan, just as the Richmond plan approved in *Bradley*, is subject to review and modification in the light of its operation. Mr. Justice Stewart in School Dist. of Abington Township, Pa. Dist. v. Schempp, 374 U.S. 203, 317, 83 S.Ct. 1560, 1621, 10 L.Ed.2d 844 (1963) (dissenting opinion) said:

"A segregated school system is not invalid because its operation is coercive; it is invalid simply because our Constitution presupposes that men are created equal, and that therefore racial differences cannot provide a valid basis for governmental action."

■■■ The Court recognizes that great weight should be given the approval of the plan by the United States Commissioner of Education. Singleton v. Jackson Municipal School Dist., 348 F. 2d 729 (5th Cir. 1965). The plan also must be tested by pertinent court decisions. Some of these have been published since the plan was adopted. In general, the plan contains adequate provisions for transition of the Greensville County school system.

The plan, however, is defective in one respect. Its provisions for staff desegregation are too limited. A satisfactory freedom of choice plan must include provisions for the employment and assignment of staff on a non-racial basis. Bradley v. School Board of the City of

Richmond, Va., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Kier v. County School Bd. of Augusta County, Va., 249 F.Supp. 239 (W.D.Va. 1966).

■■ The primary responsibility for the selection of means to achieve employment and assignment of staff on a non-racial basis rests with the school board. Witnesses for the plaintiffs and the defendants were in general agreement about the steps that must be taken to satisfactorily resolve this problem. They were not in agreement on the time table for taking these steps. The time may vary from community to community The court is of the opinion that in the first instance the board should have the opportunity to appraise realistically the time and methods required. Several principles must be observed by the board. Token assignments will not suffice. The elimination of a racial basis for the employment and assignment of staff must be achieved at the earliest practicable date. The plan must contain well defined procedures which will be put into effect on definite dates. The board will be allowed ninety days to submit amendments to its plan dealing with staff employment and assignment practices.

The plaintiffs request that the defendants be restrained from proceeding with the construction of new school buildings and additions or purchasing new school sites until an adequate plan has been adopted. In their pre-trial brief, filed November 17, 1965, the plaintiffs urge that the court should require the school board to eliminate the segregated character of the school system by locating new schools in the system so as to promote integration. Little evidence was introduced concerning new construction. Apparently the school board plans to add additional classrooms to both high schools. It also plans to construct a Negro elementary school with fifteen classrooms to serve grades one through seven with a capacity for approximately 450 pupils. This construction is designed to rid a Negro school, known as the Greensville County Training School, of its outdated frame buildings.

■ This court is loathe to enjoin the construction of any schools. Virginia, in common with many other states, needs school facilities. New construction, however, cannot be used to perpetuate segregation. White pupils in the county have not transferred to Negro schools. Greensville County's recent experience shows that Negro pupils seek transfers to white schools. This could cause overcrowding of white schools coupled with vacancies in Negro schools. Denial of requests for transfers to white schools under these circumstances could require a geographical zoning plan or some other equitable means of assignment. The problem is recognized in Wheeler v. Durham City Board of Education, 346 F.2d 768, 774 (4th Cir. 1965), where Judge Boreman said:

"[4] From remarks of the trial judge appearing in the record, we think he was fully aware of the possibility that a school construction program might be so directed as to perpetuate segregation. At the same time, he was reluctant to enter an order determining the location and size of new school facilities or what existing facilities should be enlarged. He clearly indicated his cognizance of the multitude of factors involved, such as the availability and cost of sites, the concentration of population, the present overcrowded conditions, etc. However, he was not unmindful of the responsibility of the Board in this area and he made known his conclusion that the burden would be on the Board to reasonably justify its actions and to demonstrate its good faith. Without specific or binding direction, the court expressed the hope that there would be some consultation between the parties to the litigation concerning the expansion program. The order last entered stated that the court had the assurance of the Board that its construction program would not be designed to perpetuate, maintain, or support desegregation. It has been held

that a school construction program is an appropriate matter for court consideration. Conceivably the determination of the extent to which a busy court might or should undertake to formulate, direct, supervise, or police such a program would pose many problems. In view of the numerous factors involved in determining what, how, where and when new facilities are to be constructed or what old facilities may best be enlarged and renovated to meet pressing needs, the court's reluctance to issue a specific injunction is understandable, particularly since the Board was still subject to the provisions of the order of January 2, 1963, by which *any* and *all* acts that regulate or affect the assignment of pupils *on the basis of race or color* were enjoined."

The primary responsibility concerning the selection of school sites and the construction of schools is the board's. This responsibility includes the obligation of not thwarting the county's freedom of choice plan by new construction.

The court concludes that new construction should not be enjoined. The evidence does not show that the plaintiffs will suffer irreparable harm. A new school building in itself cannot defeat the plaintiffs' choice of a desegregated education. The use, however, to which new facilities are put by the school board could cause a freedom of choice plan to become invalid. Then it will be necessary to modify the plan.

The plaintiffs' motion for the allowance of counsel fees will be denied. At the time the suit was filed no Negro pupils were being denied transfers to white schools. The case primarily involves a plan of desegregation. The situation is similar to that found in Bradley v. School Board of the City of Richmond, Va., 345 F.2d 310, 321 (4th Cir. 1965) vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), where counsel fees were not allowed for that part of the litigation pertaining to consideration of a plan.

The court concludes that defendant's motion to dismiss the complaint for failure to state a claim should be overruled. Cf. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965).