Audrey Gillis **WALL** and the North Carolina Teachers Association, a Corporation, Plaintiffs,

v.

The **STANLY COUNTY BOARD OF EDUCATION**, Defendant.

No. C–140–S–65.

United States District Court
M. D. North Carolina,
Salisbury Division.

Sept. 16, 1966.

J. LeVonne Chambers, Charlotte, N. C., and Conrad O. Pearson, Durham, N. C., for plaintiffs.

Henry C. Doby, Jr., of Patterson & Doby, and Staton P. Williams, Albemarle, N. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, District Judge.

This action was brought on August 11, 1965, by Audrey Gillis Wall and the North Carolina Teachers Association against the Stanly County Board of Education. The plaintiffs seek, under the provisions of 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. § 1983, the following relief:

(1) a preliminary and permanent injunction enjoining the defendant from dismissing, hiring and assigning teach-

ers and other professional school personnel in the Stanly County School System on the basis of race or color;

(2) an order requiring the reinstatement of the individual plaintiff in the same position or one comparable to the position she held during the school year 1964–65, (in accordance with complaint as amended February 10, 1966);

(3) retention of jurisdiction by the Court pending full and complete compliance by the defendant; and

(4) reasonable counsel fees.

The defendant moved to dismiss and for summary judgment on September 3, 1965. The plaintiffs' motion for a preliminary injunction and the defendant's motion to dismiss and for summary judgment were denied by order dated November 9, 1965.

The cause was heard by the Court sitting without a jury on April 27–29, 1966. At the completion of all the evidence, the defendant moved for dismissal of the plaintiffs' action. The Court reserved decision on the motion pending receipt of proposed findings of fact and conclusions of law from counsel for the respective parties.

Having now carefully considered all of counsels' proposals, arguments and contentions, as well as the testimony, stipulations, briefs and exhibits submitted, and the reasonable inferences to be drawn therefrom, the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.

#### In General

1. The individual plaintiff, Audrey Gillis Wall, is a Negro, and at the time of the institution of this action, a citizen of the State of North Carolina, and a resident of Stanly County, North Carolina.

2. The corporate plaintiff, the North Carolina Teachers Association, is a professional teachers association consisting principally of Negro teachers, including Negro teachers in the Stanly County School System, and will hereafter be referred to as the "Association."

3. The defendant, The Stanly County Board of Education, is an agency of the State of North Carolina charged with the responsibility of maintaining and operating and does maintain and operate a system of public schools in Stanly County, North Carolina, and will hereafter be referred to as the "Board."

4. The Board operates seventeen public schools in Stanly County: fourteen elementary and four high schools, one school being a combined elementary and high school and known as a "union school."

5. In the school year 1963–64 and the years prior thereto, all Negro pupils in the Stanly County School System (hereinafter referred to as the "System") were assigned to Negro schools, and all white students were assigned to white schools.

6. For the school year 1964–65, initial assignment of pupils was made to the schools they had attended in the school year 1963–64 with the proviso that if their parents desired that they attend another school, the parents could make application for such transfer.

7. Little public notice was given by the Board of the aforesaid right of parents to request assignment of their children to schools other than those which they had previously attended. The first and only integration of the Stanly County School System which occurred in school year 1964–65 was upon the transfer of two Negro pupils from Kingsville High School, a Negro school, to North Stanly High School, formerly an all white school.

8. For school year 1964–65, and the years prior thereto, professional personnel within the System were assigned by race. There were no Negro teachers or principals at white or predominantly white schools, and no white teachers and principals at Negro schools.

9. For school year 1964–65, and for the years prior thereto, the allocation of teacher spaces received by the defendant from the State of North Carolina indicated that the Board was authorized a designated number of white teacher spaces and a given number of Negro teacher spaces. The allocation also indicated the specific school to which the spaces were allocated. The allocations were thereupon transmitted to the several principals of schools within the System.

10. Teachers desirous of a position in the System submitted an application for employment to the principal of the school at which they wished to teach. The principal recommended the teachers he wished to employ to the local school committee for his school which committee accepted or rejected the teachers recommended for employment. If the local school committee approved the applicant, the contract was forwarded to the Board for approval or disapproval.

11. A teacher desirous of a position in the System could, rather than utilizing the foregoing procedure, submit an application to the office of the Superintendent of the System for a job in the System for which the applicant might qualify. Such applications were maintained on file in the Superintendent's office, separate files being maintained for white and Negro applicants, and were available for the perusal of the principals at their leisure.

This procedure was utilized less frequently than that in Finding Number Ten, supra.

12. Beginning in 1965, the local school committees were eliminated from any part in teacher selection. Thereafter, the principal alone ruled upon both initial applicants and former teachers at his school who desired to be employed again at the school.

13. A teacher employed at a school in the System did not annually submit an application for employment. If the teacher desired continued employment at that school during the following school year, he would make this fact known to the principal who would recommend to the Board that that teacher be retained on the faculty if the principal judged the teacher fit to teach.

14. For school year 1965–66, the Board adopted a "Plan of Compliance" under Title VI of the Civil Rights Act of 1964, under which plan pupils were not assigned to a school by race, geographic districts, or past enrollment, but rather were given a "freedom of choice" in the school to attend. The parents of all pupils in the System were required to indicate, in writing, the school which they desired their children to attend during school year 1965–66.

15. The aforesaid "freedom of choice" plan was instituted in the latter part of school year 1964–65. An intensive effort was made to insure that the forms whereon the parents were to indicate the choice of school were returned. Of some seven thousand students in the System, only about fifteen did not, even after personal contact, return the forms indicating choice of school, and these were assigned by the Board to the school nearest their residence. The majority of the pupils for whom no forms were returned were Negro and they were assigned to white schools.

16. As a result of the "freedom of choice" plan, over three hundred Negro pupils who had formerly attended all Negro schools were assigned to formerly white or predominantly white schools for school year 1965–66.

17. A curious practice has arisen in North Carolina whereby in every biennium in which the General Assembly of North Carolina is in session, no allocation of teacher spaces is made by the North Carolina Board of Education to the local school systems until after the General Assembly has adjourned sine die. This practice resulted in the allocation of teacher spaces for school year 1965–66 being received by the Board somewhat later than usual.

18. As the end of school year 1964–65 approached, and inasmuch as the Board

had received no allocation of teacher spaces for school year 1965–66, the teachers in the System became apprehensive regarding their employment in the System for the following year. To provide some appearance of security in employment, the several principals were informed by the Board that, although the Board could employ no one until the allocations arrived, any teacher who signified a desire for employment in the school year 1965–66, who was recommended by the school principal, would be promised employment upon the requisite allocations being made.

19. The allocation of teacher spaces for the school year 1965–66 was received from the State of North Carolina on or about June 25, 1965, and for the first time such spaces were allocated to the Board without reference to race, and without designation of the school to which such spaces were to be allocated.

20. When the allocation of teacher spaces was received from the State, the Board applied the formula hereinafter described, and further allocated the available spaces among the schools in the System. Such allocation was determined by a combination of the average daily attendance of each school for the school year 1964–65 as modified by certain other factors, the most important being the number of students who had transferred from one school to another pursuant to the "freedom of choice" plan. After such determination, a form letter was sent by the Board to the several principals setting forth the number of teacher spaces each would have.

21. The shifts in pupil enrollment as a result of the "freedom of choice" plan resulted in a decrease in the allocation of teacher spaces to the Negro schools and an increase in the allocation of teacher spaces to formerly white or predominantly white schools.

22. For the school year 1965–66, the Board adopted no specific provisions to govern assignment of teachers who might be affected by the shifting of pupil enrollment. The Board did not solicit opinions from either teachers or principals as to what, if any, policy might or should be adopted. Principals were not advised as to whether teachers whose positions were affected by the aforesaid reduced allotments to Negro schools would be reassigned to another school in the System.

23. The Board did not advise the several white principals that they could employ Negro teachers nor Negro principals that they could hire white teachers.

24. On June 7, 1965, the Board adopted a "Plan of Compliance" in accordance with Title VI of the Civil Rights Act of 1964. Article IV, § 10 of the Plan provided that:

"The Board of Education is aware and recognizes that school desegregation includes desegregation of faculty and is now in process of developing a policy whereby staff and professional personnel will be employed solely on the basis of competence, training, experience and personal qualifications and will be assigned to and within the schools of the unit without regard to race, color or national origin. This policy will be put into effect immediately after it is developed, but in any event to commence by the 1966–67 school term.".

25. The steps to be taken toward the implementation of the foregoing plan had not been formulated by the time allotments for school year 1965–66 were received nor by the beginning of the school term.

26. For the term in question, school year 1965–66, as had been the practice in prior years, the Board did not directly appoint teachers to teach in the System or assign teachers from a pool of such personnel to teach in the several schools. Instead, the Board allocated a number of teacher spaces to the principals of the several schools who by custom and practice were granted nearly unlimited discretion regarding the employment of professional personnel for their respective schools. This discretion included the decision both as to teachers to be newly employed in the school and as to those who had positions in the school who were to be retained.

27. The only list of teachers submitted by the principal to the Board was that containing the names of teachers recommended by the principal for employment for the following school year. If a principal did not recommend an individual either for initial employment or reemployment, the teacher's name would never come before the Board.

28. Certain personnel practices and procedures have become generally accepted nationally among personnel administrators in public school systems. The granting of almost complete authority by the school administrators in Stanly County to the school principal with no stated criteria for the evaluation of teaching personnel to determine whether or not a teacher will be allowed to teach in a particular school during the following year is at variance with generally accepted practices of personnel administration in public school systems.

29. It is a generally accepted practice in the United States that teachers should be evaluated by more than one supervisor; that evaluations of the teacher should be periodic; and that these evaluations should be flexible enough to allow for differences in teachers and in teaching situations.

30. The opening of school year 1965–66 found no white teacher teaching at a predominantly or entirely Negro school in a regular classroom situation. No Negro teacher was so situated in a white or predominantly white school. Likewise, Negro principals were found at Negro schools and white principals at white or predominantly white schools.

31. The situation described in the immediately foregoing Finding was modified in January, 1966, when a Negro teacher was employed to teach history at North Stanly High School, a predominantly white school.

## II.

### As to the Individual Plaintiff Audrey Gillis Wall

32. Audrey Gillis Wall, A.B., M.S., is a Negro and a teacher of unchallenged professional and educational qualifications, who has thirteen years of teaching experience, predominantly in Stanly County. At the time of the institution of this suit, she was employed at the Oaklawn Elementary School in Charlotte, North Carolina.

33. During the school year 1963–64, Mr. Robert E. McLendon, a Negro, was the principal of Lakeview Elementary School, at that time an all-Negro school. During the year stated, McLendon reported orally to the Superintendent of the Stanly County School System, Mr. Luther A. Adams, that he, McLendon, was having difficulties with Mrs. Wall, and that he was considering not recommending her for re-employment for school year 1964–65. During school year 1964–65, McLendon reported to Adams continued difficulties with Mrs. Wall consisting of her failure to take her pupils to the cafeteria, and her failure to supervise them during the lunch period.

34. McLendon testified that Mrs. Wall had a "negative attitude, * * * argued with me about decisions, * * * defied orders, * * * refused to do what she was told, * * * missed more than half of the required P.T.A. programs," and failed to attend either the North Carolina Teachers Association meetings or the Stanly County Teachers Association meetings although required to attend. McLendon further testified that Mrs. Wall was an inveterate complainer, did not get along with her fellow teachers, and in general was incorrigible to the point where it interfered with McLendon's discharge of his duties as principal of the school.

35. In addition, McLendon was disturbed by the absenteeism of Mrs. Wall. Although school was in session until 3:30 P.M., Mrs. Wall left the Lakeview School at about 2:00 P.M. each day during the greater portion of the Spring of 1965 in order to visit a doctor in Concord, North Carolina.

36. During the school years 1959–60 and 1960–61, Mrs. Wall taught at West Badin, an all-Negro school at the time.

During these years, Mr. G. L. Hines, a Negro, was the West Badin principal. Hines testified that their principal-teacher relations were not pleasant, saying that Mrs. Wall discussed school matters in public which were of a nature inappropriate for public discussion, and that her conduct as a teacher was inappropriate in that when disturbed she would go to another teacher's room and there display her emotions.

37. From the testimony of these two school principals, it is clear that Mrs. Wall possessed the general reputation among school authorities of being a troublemaker and hard to get along with.

38. Although McLendon held the opinion of Mrs. Wall set forth, supra, in Finding No. 34, nevertheless, when the Board indicated that it would employ teachers contingent upon the receipt of the allocation of spaces (see Finding No. 18, supra), McLendon recommended Mrs. Wall for reemployment for school year 1965–66.

39. At the time of making the foregoing recommendation, McLendon had received no specific application, other than Mrs. Wall's, for the position in which Mrs. Wall was teaching, although he did have applicants for positions at the school who possessed the appropriate certificates required to teach the grade taught by Mrs. Wall.

40. The Board approved McLendon's recommendation of Mrs. Wall contingent upon the allocation of the requisite spaces by the state. The contract was not returned to Mrs. Wall.

41. In late June, 1965, McLendon received a form letter from Adams notifying him of Lakeview's teacher space allocation for school year 1965–66. No instructions were received by him as to the manner to be employed in reducing the number of teachers at Lakeview.

42. Mrs. Wall first learned that she was not to be re-employed at Lakeview in July or August, 1965. She contacted Adams. Adams suggested that she seek employment in other schools of the Stanly County System by contacting the principals at the Richfield School, an all-white school, and the West Badin School, an all-Negro school, since the System was employing teachers on a non-racial basis.

43. Thereafter, Mrs. Wall made application in writing to all the schools in the System, but was unable to secure employment therein. Adams contacted G. L. Hines, the principal of West Badin School, regarding the possible employment of Mrs. Wall. West Badin had a vacancy, but, because of the aforedescribed difficulties Hines had experienced when Mrs. Wall had taught for him, Hines indicated that he did not want her as a teacher and requested that he not be ordered to employ her. Mrs. Wall was not employed in the System during the school year 1965–66, but obtained employment in Charlotte, North Carolina.

44. Adams made no independent evaluation of the fitness or lack thereof of Mrs. Wall, but only satisfied himself that McLendon had properly evaluated her. He arrived at the conclusion that McLendon had properly evaluated her largely as the result of his faith in the judgment of McLendon.

45. Neither Adams nor the Board compared the qualifications of Mrs. Wall or the severity of her alleged faults with those of other teachers in the System.

46. The procedures which resulted in the decision not to re-employ Mrs. Wall for school year 1965–66 are not the procedures and practices generally accepted nationally by personnel administrators in public school systems as being proper or adequate in order to make a decision not to employ a teacher on the basis of lack of fitness, whether academic or personal. Specifically, the procedures employed in Mrs. Wall's case fall somewhat below the generally accepted national norm in that (1) the accusations were lacking in specificity, (2) such were not in writing, and (3) no criteria were given to the teacher as to what was expected of her or to principals as to what to expect of teachers.

## III.

*As to Other Negro Teachers Allegedly
the Victims of Racial Discrimination
in Re-Employment in the System*

47. In addition to the individual plaintiff, Mrs. Wall, the plaintiffs contend that three Negro teachers in the System were deprived of constitutional rights as the result of the System's racially discriminatory employment practices. The other alleged victims of the foregoing practices were Mrs. Nell Holmes, Mr. Frederick Welborn and Mrs. Edrina Davis Turner.

48. Mrs. Nell Holmes taught at West Badin High School during school year 1965–66. She resigned from her position.

49. Frederick Welborn taught at West Badin High School during school year 1964–65. He was recommended for reemployment for school year 1965–66 by his principal, G. L. Hines. The teacher space allocation for West Badin High School for school year 1965–66 was less than that for school year 1964–65. Because of other resignations, Hines initially thought that Welborn might be retained, but discovered he had incorrectly computed the number of professional spaces he was allotted. Hines was on the point of informing Welborn that he would be unable to employ him at West Badin High School for school year 1965–66 when he received a letter from Welborn requesting that his resignation be accepted in order that he might accept employment in New York.

50. Mrs. Turner (also referred to in certain portions of the evidence as Miss Edrina Davis) taught at Lakeview Elementary School during school year 1964–65. Mr. McLendon recommended that she be re-employed for school year 1965–66. Believing she would be unable to teach in school year 1965–66 because of pregnancy, she resigned in June, 1965. Misapprehending the existence or extent of such pregnancy, she thereafter applied for a situation at Lakeview Elementary School but was not recommended. She was employed during school year 1965–66 by the System at South Oakboro School.

51. There is no evidence that any other Negro teacher other than Mrs. Wall, who taught in the System in school year 1964–65 *and who did not resign* prior to being informed by the principal that the teacher's former position had been terminated, applied for *any* position in the System and was not re-employed.

## IV.

*The Plan of April 15, 1966.*

52. On April 15, 1966, the Board, by resolution, adopted a "Statement of Policy" which policy provided in part:

"Staff and professional personnel shall be employed solely on the basis of competence, training, experience and personal qualification, and shall be assigned to and within schools of the Administrative Unit without regard to race, color or national origin."

A complete and thorough set of instructions, standards and detailed forms are included with and attached to the "Statement of Policy" with instructions for the use by all those concerned with the employment of professional personnel.

### DISCUSSION

#### a. *Jurisdiction*

The defendant contends that this Court lacks jurisdiction in the instant cause inasmuch as the defendant is an agency and political subdivision of the State of North Carolina, and as such is not subject to suit without its consent.

Amendment XI of the United States Constitution provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens *of another State* * * *." (Emphasis supplied)

This, the Nation's answer to Chisholm v. Georgia, 2 Dall. 419, 1 L.Ed. 440 (1793), was early held not to give juris-

diction to a United States Court to entertain a suit instituted against a state by one of its own citizens without the consent of that state. Gale v. Babcock, 4 Wash.C.C. 199, 9 Fed.Cas. 1077 (#5,-188) (C.C.D.N.J.1822).

■ Even if the most liberal interpretation possible were given the Eleventh Amendment, it is doubtful that the cases decided thereunder which denied to the United States Courts jurisdiction of suits against a state without its consent by a citizen of that state would be applicable to the instant cause. Even if matters other than the assertion of civil rights guaranteed by the United States Constitution were involved, it has long been held that the foregoing restraint of the judicial power of the United States applies only when the state is a party of record. Swasey v. North Carolina RR. Co., 1 Hughes 17, 1 Am.Law. T.Rep. (N.S.) 359, 71 N.C. 571, 23 Fed. Cas. 518 (#13,679) (C.C.E.D.N.C.1874), appeal dismissed 23 Wall. 405, 23 L.Ed. 136 (1875). In this case the State of North Carolina is not such a party.

■ It has also been held that political subdivisions of a state can be sued in a United States Court regardless of whether the defendant consents thereto. McCoy v. Washington County, 3 Wall. Jr. 381, 7 Am.Law Reg. 193, 15 Leg.Int. 388, 15 Fed.Cas. 1341 (#8,731) (C.C. W.D.Pa.1862).

Other cases set forth views divergent from those, supra, but it is unnecessary to discuss here the development and the subsequent limitation of the defense asserted by the Stanly County Board of Education. This Court must follow the decision in Griffin et al. v. School Bd. of Prince Edward County, 377 U.S. 218, 228, 84 S.Ct. 1226, 1232, 12 L.Ed.2d 256, 263 & 264 (1964), *motion for judgment forthwith granted*, 377 U.S. 950, 84 S.Ct. 1627, 12 L.Ed.2d 496 (1964), wherein it was held that:

"It is contended that the case is an action against the State, is forbidden by the Eleventh Amendment, and therefore should be dismissed. The complaint, however, charged that state and county officials were depriving petitioners of rights guaranteed by the Fourteenth Amendment. It has been settled law since Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 [13 L.R.A.,N.S., 932] (1908), that suits against state and county officials to enjoin them from invading constitutional rights are not forbidden by the Eleventh Amendment."

b. *Parties Plaintiff*

■ The defendants contend that as to the corporate plaintiff, The North Carolina Teachers Association, this action should be dismissed inasmuch as the defendant never had any legal or contractual relationship with the plaintiff and that, therefore, the corporate plaintiff is not a proper party to maintain the present action. No authority was cited by the defendant for this contention. That contention is best answered by the words of Judge Parker in Alston et al. v. School Board of City of Norfolk et al., 4 Cir., 112 F.2d 992, 997, 130 A.L.R. 1506, cert. den. 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448 (1940):

" * * * we have no doubt as to the Norfolk Teachers Association being a proper party to the suit. According to the complaint, it is a voluntary unincorporated association and 'is composed of Negro teachers and principals in the public colored schools of Norfolk'; and the right of such an association to sue in its common name for the purpose of enforcing substantive rights under the Constitution of the United States is provided for under the Rules of Civil Procedure. Rule 17(b), 28 U.S.C.A. following section 723c."

Also see NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488, 1498 (1958), aff'd 360 U.S. 240, 79 S.Ct. 1001, 3 L.Ed.2d 1205 (1959), rehearing den. 361 U.S. 856, 80 S.Ct. 43, 4 L.Ed.2d 96 (1959); Buford et al. v. Morganton City Bd. of Education, 244 F.Supp. 437, 445 (W.D. N.C.1965).

#### c. *The District Court's Responsibility*

In the instant case this Court views its power and duty to be no less than the proper sphere of responsibility assigned to a District Court by the United States Supreme Court in a case involving the discriminatory application of a voting test wherein Mr. Justice Black, speaking for that court said of the District Court:

"* * * the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana et al. v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709, 715 (1965).

This does not mean that the Court is required to walk strange paths or to work wonderously new deeds in the contemporary toilsome, tortuous quest for equal treatment and racial goodwill, but when such controversies are presented, fraught not only with constitutional but with complex social problems long in need of resolution, it is incumbent upon the courts to adopt as creative and activist an approach as possible lest constitutional rights become hollow in the face of justified, unredressed social needs and the continuance of racial discrimination. Dror, "Law and Social Change", 33 Tulane Law Rev. 787, 794 (June 1959). The Supreme Court has recognized that the assignment of pupils and the employment and assignment of teachers are not severable problems but rather ones which interact on one another with many of the same principles applicable to one class of cases equally applicable to the other. Bradley et al. v. School Board of City of Richmond, et al., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

Nevertheless, the late Judge Parker's analysis of Brown et al. v. Board of Ed. of Topeka, et al., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954), is regarded as remaining valid when, speaking for a United States District Court of three judges, he said:

"* * * it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. *It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend.* What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals." Briggs et al. v. Elliott et al., 132 F.Supp. 776, 777 (E.D.S.C. 1955).

The foregoing interpretation was recently re-affirmed in this Circuit by Bradley et al. v. School Board of City of Richmond, Virginia, 4 Cir., 345 F.2d 310, 316 (1965), rev. on other grounds 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

It is now clear that the Fourteenth Amendment of the United States Constitution forbids discrimination on account of race by a public school system with respect to the employment and assignment of teachers, Franklin et al. v. County School Board of Giles County et al., 4 Cir., 360 F.2d 325, 327 (1966), and as stated by Circuit Judges Sobeloff and Bell in a separate opinion (concurring in part and dissenting in part) in the Bradley case, supra, 345 F.2d, at p. 323:

> "It is now * * * high time for the court to insist that good faith compliance requires administrators of schools to proceed actively * * * to undo the segregation which both by action and inaction has been persistently perpetuated."

Further delays in the elimination of discrimination on the basis of race in the public schools, whether among pupils or teachers, are intolerable. Goss et al. v. Board of Education et al., 373 U.S. 683, 689, 83 S.Ct. 1405, 10 L.Ed.2d 632, 636 (1963); Rogers et al. v. Paul et al., 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265, 267 (1965); Calhoun et al. v. Latimer et al., 377 U.S. 263, 264–265, 84 S.Ct. 1235, 12 L.Ed.2d 288, 289 (1964); Singleton et al. v. Jackson Municipal School Dist. et al., 5 Cir., 355 F.2d 865 (1966); Kier et al. v. County School Board of Augusta County, Virginia, et al., 249 F.Supp. 239, (W.D.Va.1966); Bell et al. v. School Board of the City of Staunton, Virginia, et al., 249 F.Supp. 249 (W.D.Va.1966).

### d. *Analysis of the Issues*

Two forms of relief are sought by the plaintiffs. The individual plaintiff seeks an order requiring her reinstatement as a teacher in the System in the same or comparable position as that she held in school year 1964–65. The corporate plaintiff seeks an order enjoining the defendant, its agents, employees successors from hiring, assigning and dismissing teachers and other professional personnel on the basis of race or color and from continuing any policy, custom or usage grounded on race or color.

In regard to the individual plaintiff, two issues are presented: (1) Was the plaintiff denied due process of law by the manner in which she was denied re-employment? and (2) Was she denied the equal protection of the laws by being denied re-employment because of unlawful racial considerations?

In regard to the corporate plaintiff, the two issues presented are: (3) Do the policies, practices and usages of the defendant deny those of the class represented by the corporate plaintiff equal protection of the law? and (4) Does the defendant continue to practice racial discrimination in the employment and assignment of its professional personnel?

### (1) *Was the Individual Plaintiff Denied "Due Process of Law"?*

One who seeks an answer to this issue in the General Statutes of North Carolina seeks in vain. No procedures are therein set forth granting to a public school teacher, who is not recommended by her principal at the conclusion of a school year for employment in the school during the following school year, any right of appeal or opportunity for the presentation of her case to the school board or other county or state authorities. Counsel have cited no regulation to the Court granting a public school teacher the benefits of such formalized procedures nor does the evidence reveal the existence of such procedures established in North Carolina by practice or custom. The search for any court-imposed procedures in North Carolina resulting from judicial interpretations of the requirements of due process of law is equally fruitless. In addition, in North Carolina, teachers do not get tenure and are in fact employed for only one year at a time. General Statutes of North Carolina, Chapter 115, § 142.

Counsel have not cited nor has the Court been able to find any case holding that the Due Process Clause of the Fourteenth Amendment requires, in a State where no teacher tenure exists, and in which the State does not provide for notice and hearing by statute, regulation, or custom, that the teacher, whom the principal does not intend to recommend for re-employment for a subse-

quent school year, is entitled to a formal hearing.

■ The Court, therefore, is of the opinion that the failure to provide the plaintiff, Mrs. Wall, a formal hearing and an opportunity to rebut before the Board or other authority the allegations against her would not be a denial of due process of law in itself, even though the procedure used was not, as an imminent educator testified, in accordance with the preferable norms of personnel administration.

■ The decision to re-employ a teacher in North Carolina for a subsequent school term is a matter of discretion vested in the principal, who makes the recommendation to the superintendent and Board of Education which approve it. However, professional personnel are not at the mercy of any whimsical or arbitrary decision school administrators or a County Board of Education may care to make regarding their retention or re-employment. There is ample authority grounded presumably on The Constitution of North Carolina, Article I, § 17, that those connected with school administration including the County Boards of Education (and as this Court holds, also school principals) must act "in good faith" and not "arbitrarily, capriciously or without just cause" or be "activated by selfish motives." Cody v. Barrett, 200 N.C. 43, 156 S.E. 146 (1930); Harris et al. v. Board of Education of Vance County et al., 216 N.C. 147, 4 S.E.2d 328, 330 (1939).

Johnson v. Branch et al., 4 Cir., 364 F.2d 177 (decided June 6, 1966), in applying the requirements of the Fourteenth Amendment stated the case thus:

"The statute gives discretion to the school board in deciding whether or not to continue the employment of a teacher. Discretion means the exercise of judgment, not bias or capriciousness."

To like effect, see Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285, 293 (1961); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680,

6 L.Ed.2d 982 (1961); Slochower v. Board of Education of City of New York, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), rehearing den. 351 U.S. 944, 945, 76 S.Ct. 843, 100 L.Ed. 1470 (1956); Wieman et al. v. Updegraff, et al., 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

It must, therefore, be determined whether Robert E. McLendon, the principal of Lakeview Elementary School, acted arbitrarily and capriciously in refusing to recommend that Audrey Wall be re-employed for school year 1965–66.

The Court has made specific Findings of Fact, supra, that Mrs. Wall was regarded by those involved in public school administration in Stanly County as being a troublemaker and incorrigible; that one of her former principals, G. L. Hines of West Badin School, regarded his principal-teacher relations with Mrs. Wall as "not being pleasant" and that her conduct as a teacher in the school was disturbing.

The Court also found as facts that McLendon, after observing her performance for school year 1963–64, "seriously" considered not recommending her for employment in his school for school year 1964–65; that he regarded her as being negatively orientated, insubordinate and a complainer who did not "get along with her fellow teachers" and whose attitude hampered him in the discharge of his duties as principal—sufficiently so as to cause him to report some of the difficulties with Mrs. Wall to the Superintendent.

In spite of the manifold irritations which McLendon claimed to have endured as the result of Mrs. Wall's presence, he nevertheless recommended to the Superintendent, who subsequently transmitted the recommendation to the Board that she be employed for school year 1965–66. It is not contended by the plaintiffs that the foregoing activity created any contractual relations or established any property rights inuring to Mrs. Wall, the benefits of which she was deprived by the Board. That such a

course of events may be otherwise significant will be discussed, infra.

■ In view of the Findings of Fact, supra, supported by ample evidence, including inferences from Mrs. Wall's own statements, it cannot be said that the principal acted arbitrarily or capriciously in withdrawing his recommendation of the plaintiff for employment for school year 1965–66 when presented with an opportunity for removing her from his school without the necessity to replace her. It is accordingly held that the individual plaintiff was not denied due process of law.

### (2) *Was the Individual Plaintiff Denied Equal Protection of the Laws?*

Before any effective inquiry can be made into the question of whether Mrs. Wall, by the above-described action of her principal, was denied the equal protection of the laws in violation of the Fourteenth Amendment, it must first be determined on whom is the burden of proof. The defendants contend that the burden is on the plaintiffs to establish by the greater weight of the evidence that she or other members of her class were not re-employed by the defendant on the basis of race, citing Buford et al. v. Morganton City Board of Education, supra; Chambers et al. v. Hendersonville City Board of Education, 245 F.Supp. 759 (W.D.N.C.1965); Brooks et al. v. School District of City of Moberly, Missouri, et al., 8 Cir., 267 F.2d 733 (1959), cert. den. 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959); Parker v. Board of Education of Prince George's County, Md., 237 F.Supp. 222 (D.Md.1965), aff'd per curiam, 4 Cir., 348 F.2d 464 (1965), cert. den., 382 U.S. 1030, 86 S.Ct. 653, 15 L.E.2d 543 (1966), rehearing den. 383 U.S. 939, 86 S.Ct. 1071, 15 L.Ed.2d 857 (1966); and Johnson v. Branch, et al., 242 F.Supp. 721 (E.D.N.C.1965).

Subsequent to the submission of briefs in this case, the United States Court of Appeals for the Fourth Circuit reversed the decision of the District Court in the *Johnson* case, supra, (Decided June 6, 1966), and also the decision in the *Chambers* case, supra. In the latter case, involving failure to renew the contracts of Negro teachers following racial desegregation of pupils in a system formerly segregated both as to pupils and teachers, it was held:

"In this background, the sudden disproportionate decimation in the ranks of the Negro teachers did raise an inference of discrimination which thrust upon the School Board the burden of justifying its conduct by clear and convincing evidence. Innumerable cases have clearly established the principle that under circumstances such as this where a history of racial discrimination exists, the burden of proof has been thrown upon the party having the power to produce the facts. In the field of jury discrimination see: (cases cited) * * * The defendants' reliance on Brooks v. School District of City of Moberly, Missouri, 267 F.2d 733 (8 Cir. 1959), is not well founded. In that case the School Board had promptly proceeded to desegregate following the *Brown* case. Furthermore, the facts showed that the School Board, prior to the end of the school year, carefully compared the qualifications of *all* the teachers, using previously established uniform standards. The procedure resulted in the failure to rehire both white and Negro teachers." Chambers et al. v. Hendersonville City Board of Education, 4 Cir., 364 F.2d 189 (Decided June 6, 1966).

The facts in the *Chambers* case differ materially from those in the case at bar. There the number of Negro teachers, following disestablishment of racial segregation among pupils, was reduced by *two-thirds*. In the instant case, the evidence shows that *only one Negro teacher*, the individual plaintiff, Audrey Gillis Wall, among those teachers alleged to have been denied re-employment for school year 1965–66 on the basis of race, who indicated a desire to teach in the System in school year 1965–66, was not rehired by the System. There is no "sudden disproportionate decimation in the ranks of the Negro teachers" here.

"One swallow doth not a summer make," and this Court entertains serious doubts as to whether the decision of the Court of Appeals in the *Chambers* case regarding burden of proof in a case involving the failure to re-employ a Negro teacher following disestablishment of pupil racial segregation should, following a finding of a failure to rehire only one Negro teacher, shift the burden of proof to the defendant Board of Education. Nevertheless, such would seem to be the trend and the *Chambers* doctrine as enunciated by the Court of Appeals of this Circuit on the matter of burden of proof in such cases is adhered to.

When considering the plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, more must be done than to determine whether there were any forms or procedures the benefit of which might have been denied to the plaintiff, or to determine whether the school principal as an agent or employee of the defendant exercised his discretion in good faith and not arbitrarily or capriciously.

As the matter was stated in Wheeler et al. v. Durham City Board of Education, 4 Cir., 363 F.2d 738 (Decided July 5, 1966) wherein the Court of Appeals, commenting on Bradley et al. v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), said:

"We read the decision as authority for the proposition that removal of race considerations from faculty selection and allocation is, as a matter of law, an inseparable and indispensable command within the abolition of pupil segregation in public schools as pronounced in Brown v. Board of Education, supra, 347 U.S. 483, 74 S.Ct. 686 [98 L.Ed. 873, 38 A.L.R.2d 1180]."

\* \* \* \* \*

"The only factual issue is whether or not race was a factor entering into the employment and placement of teachers."

To the same effect, see Franklin et al. v. County School Board of Giles County, et al., supra, 360 F.2d 325; Bradford v. School District No. 20, Charleston, S. C., et al., 4 Cir., 364 F.2d 185 (Decided June 6, 1966); Chambers et al. v. Hendersonville City Board of Education, supra; Board of Public Instruction of Duval County, Fla., et al. v. Braxton et al., 5 Cir., 326 F.2d 616, 620 (1964), cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed. 2d 216 (1964).

It is now clear that the Equal Protection Clause of the Fourteenth Amendment requires that when pupil desegregation necessitates the reduction in teacher spaces in Negro schools, the Negro teachers occupying those spaces do not thereby automatically lose their positions, but, on the contrary must be evaluated for such positions for which they are qualified as exist in the entire system and not merely for such *vacancies* as may exist at the time such teacher receives notice that the position formerly held has been terminated. Franklin et al. v. County School Board of Giles County, supra; Chambers et al. v. Hendersonville City Board of Education, supra. Such teacher must not be treated as a new applicant but must be considered on a comparative basis with all white and Negro teachers seeking re-employment. Christmas et al. v. Board of Education of Harford County, Md., et al., 231 F. Supp. 331 (D.Md.1964).

It is obvious that if the teacher spaces at Lakeview had not been reduced, Mrs. Wall would have been re-employed for the school year 1965–66. There is creditable evidence from the depositions of McLendon and Hines that Mrs. Wall's attitude, temperament, lack of personal discipline and general failure to devote her abilities to the performance of her work seriously affected her value as a teacher. Her classroom ability, isolated from her personal traits, is unquestioned, and it is apparent that McLendon was willing to retain her with her deficiencies rather than incur her disfavor and the risk of an untried teacher. The

opportunity came for him to re-evaluate Mrs. Wall's qualifications, consider and exercise his discretion and he did so. It is not considered highly significant, in view of the facts, that initially he recommended her for re-employment.

The question appears to the Court to be that of what motivated the decision not to retain her, rather than a mere determination of the ultimate cause for the failure to re-employ her. Was the decision based on race and reduced teacher spaces or was the decision motivated by other and proper considerations?

In the present case, the facts are not those in Franklin et al. v. County School Board of Giles County et al., supra, wherein not only did pupil desegregation and the closing of Negro school result in *all* Negro teachers not being rehired but the administrators in that school system failed to treat the Negro teachers as they had previously treated displaced white teachers. Neither are the facts in the present case those found in Chambers et al. v. Hendersonville City Board of Education, supra, wherein the Negro teacher population was reduced by *two-thirds* and there existed a stated policy to limit Negro teacher re-employment to a number corresponding with the number of Negro pupils in the school system. There is not involved in this case an attempt to penalize a teacher for exercising rights of free speech and assembly guaranteed by the First Amendment. Johnson v. Branch et al., supra.

Subsequent to her receipt of notification that she would not be re-employed at Lakeview Elementary School for school year 1965–66, Mrs. Wall applied for employment at West Badin School whose principal was the aforementioned Hines, for whom she had formerly taught. Superintendent Adams contacted Hines about Mrs. Wall's employment at his school. Hines requested Adams that he not be required to take her. In his deposition, Hines stated his reasons for not wanting her as a teacher at his school, and his description of his (reinforced by the fact that he had known her for almost two decades) principal-teacher relations with her substantiated the description of McLendon's experiences.

The action of McLendon might be constitutionally suspect if there did not here exist the most cogent of evidence substantiating the reasons advanced by McLendon for not recommending Mrs. Wall for re-employment for school year 1965–66 following the receipt of the new teacher space allocations. The Court is of the opinion that under these facts, it having been shown that Mrs. Wall by temperament, disposition and attitude was unworkable in the System, the cases requiring an objective and comparative evaluation with all other teachers are not controlling.

(3) *Were any Other Negro Teachers Denied Constitutional Rights Under the Equal Protection or Due Process Clause?*

The plaintiffs have contended that three other Negro teachers, Mrs. Edrina Davis Turner, Mrs. Nell Holmes and Mr. Frederick Welborn were victims of racial discrimination in re-employment in the System.

As indicated in Part (d) (2), supra, of this Opinion, the burden of proof in this case is taken by this Court to rest with the defendant herein, but those cases, applying the burden in such manner, can only be held to apply when those allegedly discriminated against have either initially applied or re-applied for a position in the System and thus indicated a desire to teach in the System and *have not, in fact, been re-employed* therein.

This Court has found, and the evidence confirms, that Mrs. Turner, Mrs. Holmes and Mr. Welborn submitted formal resignations to their principals prior to the receipt of notice by those teachers that their former positions had been terminated.

Mrs. Turner was in fact during school year 1965–66 employed in the System at a different school and has no ground for

complaint. Mrs. Holmes resigned and there is no indication that she wished employment in the System or attempted to secure it. Welborn obtained employment in New York and there is no indication that he applied for any position in the System other than that formerly held by him, which he relinquished by resignation.

 Accordingly, the defendant School Board is under no duty to produce evidence indicating why these teachers were not considered in an objective, comparative manner with other teachers who taught in the System in school year 1965–66.

(4) *Do the Present Employment Practices of the Board Deny Those Represented by the Corporate Plaintiff Due Process of Law and Equal Protection of the Laws?*

The plaintiffs request an injunction forbidding the Board to continue alleged racial discrimination in the employment and assignment of teachers. The essential contention of the plaintiffs is that the plan adopted by the Board on April 15, 1966, (Plaintiff's Ex. 5) (hereinafter referred to as the "Plan") constitutes little, if any, change in the policy from that under which the Board operated in school year 1965–66 and under which faculty desegregation, while not totally absent, has been negligible and further that it is designed to perpetuate the conditions then existing.

As stated in part "c", supra, of this Opinion, the elimination of racial discrimination in the employment and assignment of teachers in public school cannot be considered as something separate from the elimination of discrimination in pupil assignments.

 As the court (with slightly different facts) in Kier et al. v. County School Board of Augusta County, Virginia, et al., supra, 249 F.Supp. at p. 246 has stated the matter:

"Where, as here, the school authorities have 'chosen to adopt a freedom of choice plan which imposed upon the individual student, or his parent, the duty of choosing in the first instance the school which he will attend (and where the burden of desegregating is imposed upon the individual Negro student or his parents), it is essential that the ground rules of the plan be drawn with meticulous fairness. 'The ideal to which a freedom of choice plan must ultimately aspire, as well as any other desegregation plan, is that school boards will operate "schools," not "Negro schools" or "white schools." ' Brown v. County School Bd., supra, 245 F.Supp. at 560. See Bradley v. School Bd., supra, 345 F.2d at 324 (dissenting opinion). Freedom of choice, in other words, does not mean a choice between a clearly delineated 'Negro school' (having an all-Negro faculty and staff) and a 'white school' (with all-white faculty and staff). School authorities who have heretofore operated dual school systems for Negroes and whites must assume the duty of eliminating the effects of dualism before a freedom of choice plan can be superimposed upon the pre-existing situation and approved as a final plan of desegregation. It is not enough to open the previously all-white schools to Negro students who desire to go there while all-Negro schools continue to be maintained as such. Inevitably, Negro children will be encouraged to remain in 'their school,' built for Negroes and maintained for Negroes with all-Negro teachers and administrative personnel. See Bradley v. School Bd., supra, 345 F.2d at 324 (dissenting opinion). This encouragement may be subtle but it is nonetheless discriminatory. The duty rests with the School Board to overcome the discrimination of the past, and the long-established image of the 'Negro school' can be overcome under freedom of choice only by the presence of an integrated faculty."

The plaintiffs contend that the Plan falls short of the Constitutional requirements for such plans citing several cases in support of their contention.

The teacher assignment plan in Kier et al. v. County Board of Augusta County, Virginia, et al., supra, 249 F.Supp. at p. 247, was held constitutionally defective because it did not indicate that teachers would be assigned to *each school* in the system regardless of race. The Plan of the defendant herein provides:

"Staff and professional personnel * * * shall be assigned *to and within the schools of the Administrative Unit* without regard to race, color, or national origin." (Emphasis supplied)

Bell et al. v. School Board of City of Staunton, Virginia, et al., supra, in regard to teacher assignments contains no analysis of what is constitutionally permissible in a case such as that at bar, but merely considers re-employment rights of Negro teachers displaced as the result of the disestablishment of pupil segregation.

This Court does not regard the Equal Protection and Due Process Clauses of the Fourteenth Amendment nor does it read the opinions of the Court of Appeals of this Circuit, a Court which has been in the vanguard of judicial efforts to remove the heavy and insensate hand of racial discrimination from pupil assignments and teacher employment, as requiring this Court to order the defendant to adopt a plan such as that required by the Court in Dowell v. School Board of Oklahoma, 244 F.Supp. 971, 978 (W.D. Okl.1965) which not only required the defendant to proceed toward a goal of obtaining the "same approximate percentage of non-white teachers in each school as there now are in the system" but prohibited the School Board therein from wholly delegating to the school principals the authority to select teachers.

This Court regards the principal enunciated by the Court of Appeals in regard to pupil assignment to be equally applicable to the employment and assignment of teachers:

"As we clearly stated in Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962), the appellants are not entitled to an order requiring the defendants to effect *a general intermixture of the races in the schools* but they are entitled to an order enjoining the defendants from refusing admission to any school to any pupil *because of the pupil's race.*" Bradley et al. v. School Board of City of Richmond, Virginia, 4 Cir., 317 F.2d 429, 438 (1963). (Emphasis supplied)

The subsequent history of the case is not regarded as modifying the principle so enunciated.

In Wright et al. v. County School Board of Greenville County, Va., 252 F.Supp. 378 (E.D.Va.1966); Thompson et al. v. County School Bd. of Hanover County et al., 252 F.Supp. 546 (E.D.Va.1966); Turner et al. v. County School Board of Goochland County, Va., 252 F.Supp. 578 (E.D.Va.1966), the plans of the defendant school boards were held to be constitutionally defective as being "too limited." The cases, however, contain no analysis or discussion of the several plans nor do they set forth any guidelines as to what manner of plan would meet constitutional standards. The "plans" themselves as set forth in the opinions are little more than one-paragraph statements of policy and unlike the Plan of the defendant herein, contain no detailed methods and procedures which must be complied with by all concerned in order to eliminate discrimination. The cases cited, supra, can thus provide little guidance for this Court.

The plaintiff also contends that the Plan is violative of the new guidelines and standards promulgated by the Office of Education of the Department of Health, Education and Welfare pursuant to 42 U.S.C.A. § 2000(d) et seq., compliance with which is a condition precedent for obtaining the various federal funds now deemed essential to the operation of a public school.

To say that the Plan fails to meet the criteria established by a Department of the Executive Branch of the government, which for policy reasons

may impose whatever conditions it wishes on the recipients of its benefits, (with the proviso that such conditions must be, in accordance with law, not constitutionally defective by reason of arbitrariness or capriciousness), is not to say that the Plan is constitutionally defective. The Court does not, however, make a finding as to whether the Plan complies with the aforesaid guidelines and standards. The standards by which the Court must judge the Plan emanate from the Constitution. The courts cannot abdicate their responsibility for determining whether a school desegregation plan violates constitutional rights and defer to standards established by the Executive Branch of the Government. Kemp et al. v. Beasley et al., 8 Cir., 352 F.2d 14, 19 (1965); Singleton et al. v. Jackson Municipal Separate School Dist. et al., supra.

In order to make such determination, the totality of the Plan must be considered. The plaintiff contends that the Plan advances the method of employment, re-employment and assignment of teachers little beyond the methods and procedures which prevailed in school year 1965–66, which former method resulted in little faculty desegregation.

The Court is of the opinion that the plaintiffs greatly underrate the scope and thrust of the defendant's Plan. The Plan is viewed as being materially different from the procedures employed in school year 1965–66. It establishes the most meticulous standards and procedures for rating and evaluating the teachers in the System. Almost every facet of the teacher, the teacher's performance, testing, training, personality, effectiveness, family, record of absenteeism, physical condition, etc., is recorded in detail. Exact guidelines for the preparation and the standards and methods by which the aforesaid attributes of the teacher are to be evaluated are likewise contained in the Plan. A portion of the information, indeed, an important portion to the principal who is interviewing and evaluating the teacher, is strictly objective information—i. e., results on national teacher's examinations, days absent from employment, education. *Each year a detailed evaluation sheet must be prepared by the principal for each teacher in his school, including those he does not recommend, including a detailed summary of problems which have arisen with that teacher and what the principal has done to resolve or eliminate them.*

It is this mass of highly detailed information required by the Plan which will cause discrimination by anyone in the System regarding the employment, re-employment or assignment of teachers to be almost immediately patent and, therefore, as a practical matter, impossible. In no case examined by the Court has a Plan of such comprehensiveness in evaluation been found.

The plaintiffs have attacked that portion of the interview form adopted by the Board whereby it is indicated:

"Is applicant willing to teach in the following situations? (check)

Integrated ———

All white ———

All Colored ———"

The Court finds nothing, *per se,* wrong with this portion of the interview form. It could be subject to abuse but only its use will so reveal. It can also be of value to the several principals and the superintendent in the integration of school facilities. As the court in Wheeler et al. v. Durham City Board of Education, supra, indicated, there are probably numerous new applicants for teaching positions who would welcome the opportunity and the challenge afforded in teaching students of ethnic and cultural backgrounds different from themselves.

The courts in Wanner et al. v. County School Board of Arlington County, Va., 4 Cir., 357 F.2d 452, 454 & 455 (1966) and Olson v. Board of Ed. of Union Free Sch. Dist. No. 12, Malverne, N. Y., et al., 250 F.Supp. 1000, 1010 (E.D.N.Y.1966) held that although the Constitution is supposedly colorblind, courts may nevertheless, in school deseg-

regation cases, allow school auhorities to make some references to race in eliminating racial discrimination. It is not believed that the Board here has transgressed further than the allowable area.

Even if the applicant is possessed of racial prejudice and would be unwilling to teach in a racially integrated situation, it is preferable to know this fact at the outset of the interview rather than on the first day of school. As the court stated in Bradley et al. v. School Board of City of Richmond, Virginia, supra, 345 F.2d at 316:

"There is no hint of a suggestion of a constitutional requirement that a state must forbid voluntary associations or limit an individual's freedom of choice except to the extent that each individual's freedom of choice may be affected by the equal right of others."

No Constitutional objection to the Plan is found.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of the controversy.

2. The objection of the defendant to the jurisdiction of the Court is overruled.

3. The motion of the defendant to strike the corporate plaintiff as a party plaintiff is denied.

4. The individual plaintiff was not denied Due Process of Law or Equal Protection of the Law by the defendant.

5. No person among those alleged has been denied Due Process of Law or the Equal Protection of the Law by the defendant.

6. The Plan adopted by the defendant is not constitutionally objectionable.

7. The application for reinstatement of the individual plaintiff is denied.

8. The request of the corporate plaintiff for an injunction is denied.

9. The motion of the defendant to dismiss should be allowed.

Counsel for the defendant will prepare and submit to the Court an appropriate judgment.